Birdie Amsterdam, J.
The defendant Investors Mutual, Inc. (hereinafter called “Mutual”) appears specially herein and moves for an order, pursuant to section 237-a of the Civil Practice Act, to set aside the service upon it of the summons and complaint herein. The motion is predicated upon the ground that Mutual is a foreign corporation not doing business and not qualified to do business in New York. The service was made on April 1,1961 on Mutual’s director, Charles T.Treland, Jr. It is undisputed that the service on Mr. Ireland complied with section 229 of the Civil Practice Act. The decisive issue on this motion is whether or not Mutual is doing business in the State of New York to such an extent as to make it amenable to the service of process within the State.
This action is a stockholder’s derivative action allegedly brought by plaintiff on behalf of the defendant Mutual. The defendants are the directors of Mutual, and a corporation known as Investors Diversified Services, Inc. (hereinafter called “ IDS ”). IDS serves as Mutual’s investment manager and as the distributor of the shares of Mutual. The complaint charges that the fees and commissions which IDS received for its services were and are excessive, and, that the directors caused them to be paid pursuant to a conspiracy to benefit IDS at the expense of Mutual. Plaintiff seeks declaratory relief and an accounting for the defendants’ profits and Mutual’s damages.
In support of its motion, Mutual shows that it was organized in 1940 as a Nevada corporation; that its only office is in Minneapolis, Minnesota; that it is not licensed to do business in New York and has no office space, no officers and no employees in this State; that its business records are in Minneapolis; none are here. As of February 28, 1961, its 152,521,205 outstanding shares, representing net assets of $1,724,526,526, were held by 320,692 shareholders residing in every State of the Union and in many foreign countries. The largest number of shareholders, about 10%, are in Minnesota. No meeting of Mutual’s shareholders or directors has ever been held in New York.
*964 Plaintiff, while he does not dispute the aforesaid presented by Mutual, seeks to overcome their effect by setting forth herein additional facts. Most of them appear from Mutual’s own prospectus of January 12,1961, which is annexed herein as an exhibit to plaintiff’s answering affidavit. The prospectus shows that Mutual is an investment company of the type commonly known as a “ Mutual Fund ”. Its business is twofold: in the first place, it raises money by selling its own shares to the public on a continuous basis; in the second place, it invests and reinvests these moneys in a wide variety of marketable securities. By reason of its continuous stock-selling activities, the number of Mutual’s shares outstanding in the hands of the public has grown, from year to year, from about 43 million shares in 1951, to about 150 million shares at this time (prospectus, bottom p. 2). The net assets of Mutual, consisting mostly of marketable securities, amount, as of February 28, 1961, to about $1,700,000,000. (See p. 2, par. 6 of affidavit of Harold K. Bradford.)
The stock-selling and investing activities of Mutual are conducted, on its behalf, by the heretofore mentioned corporation, Investors Diversified Services, Inc. (IDS), which is named and has appeared as a defendant in this action. The links between Mutual and IDS are very close. Mutual was actually organized by IDS as evidenced by the following statement at page 20 of the prospectus: “ Investors organized and is principal underwriter and investment manager of Investors Mutual, Inc.”. The two companies share the same principal office in Minneapolis, Minnesota. The entire business of Mutual is conducted exclusively by IDS. There is a considerable interlock between their directors and officers (prospectus, pp. 18-19). The prospectus (front cover and p. 2) describes Mutual as being “ affiliated ” with IDS. With respect to the sale or distribution of the stock of Mutual, the prospectus (p. 17) states that, since the inception of Mutual, “ its shares have been distributed exclusively by ” IDS, pursuant to distribution agreements between the two companies. Applications for shares of Mutual are solicited by representatives of IDS and are submitted to Mutual in Minneapolis for acceptance or rejection (ibid.).
A substantial part of the activities by which the shares of Mutual are sold to the public takes place in New York. Mutual’s shares of stock are distributed throughout the country, including New York, by IDS. The number of Mutual shares sold each year to New "York investors through the distributing activities of IDS in New York amounts to millions of dollars.
IDS, which is licensed to do business in New York, maintains a branch office in Mount Vernon, New York. One of the windows *965 of that office bears a legend indicating that IDS is the investment manager and distributor of Mutual. While Mutual subscribes for no telephone in New York, its name does appear under that of IDS, in the “ Yellow Pages ” of the 1961 Manhattan Classified Telephone Directory, under the heading “ Mutual Funds ”.
So far as the investing activities of Mutual are concerned, the prospectus (pp. 1, 18) states that IDS “ is, by contract, the investment manager of the fund ’ ’, and that IDS 1 ‘ has acted as the investment manager of the company (i.e., Mutual) since the Company’s inception”. The prospectus further states (p. 2) that “ The investment manager (i.e., IDS) normally places purchase and sale orders for most New York Stock Exchange common stocks through one member house which receives a fixed fee payable out of aggregate commissions. This firm distributes orders to a large number of member firms (usually between 30-40 firms), as directed by the investment manager.” The distribution of brokerage business is determined from time to time by the investment manager. IDS thus acts as the exclusive agent of Mutual with respect to purchases and sales of the latter’s portfolio securities. The extent of those portfolio transactions partakes of considerable proportions. In the fiscal year ending September 30, 1960, IDS purchased, for Mutual, about $321,000,000 worth of securities and sold for it about $209,000,000 worth of securities (prospectus, pp. 24, 26).
The purchase and sale of Mutual’s portfolio securities occurs in large part in New York. As shown by the portion of the prospectus just quoted, IDS places its purchase and sales orders as the agent of Mutual, and those orders are executed on the New York Exchanges. IDS selects the brokers so as “ to give recognition to those member firms (brokers) which are capable of rendering services and which, over time, do provide services over and above the bare brokerage function, although this is not an absolute standard since some business may be distributed solely on the basis of the best business judgment of the investment adviser (IDS). The distribution of brokerage business is determined from time to time by the investment manager (IDS) with a view to obtaining the maximum usefulness from the firms handling portfolio transactions. Such service may be in terms of expeditious handling of orders, contributions made by such firms’ research staffs in supplementing, aiding, or otherwise helping the research activities of the investment manager, wire services, quotations, statistical and economic data and reports, and other related services which large brokerage houses can and do render to important buyers and sellers of securities without extra charge ” (prospectus, p. 2).
*966 While not disputing any of the foregoing facts, Mutual adduces yet others. IDS performs its aforesaid services as Mutual’s investment adviser and as the distributor of Mutual’s shares pursuant to two contracts with Mutual. Each contract designates IDS as an “ independent contractor”. IDS has similar contracts with, and performs similar services for, four other mutual funds. Mutual and these four other funds are designated as “ affiliated investment companies ” (prospectus, p. 14).
Under the investment advisory agreement, the recommendations of the IDS security analysts are passed on to a designated Mutual officer for approval or rejection. All final investment decisions are made in Minneapolis. Orders for the sale or purchase of securities are 11 initiated ” in Minneapolis, but are executed through the New York Exchanges and elsewhere. Mutual’s portfolio securities are kept in the custody of the Bank of Delaware, in Wilmington, Delaware. Upon the purchase or sale of securities, delivery is made to or by said bank. The investment advisory and the distributing contracts between Mutual and IDS are made in Minnesota. All transactions between Mutual and IDS, including payments, take place outside of New York.
In determining whether, upon these facts, Mutual is doing business in New York, it is the cumulative significance of all the activities conducted in this jurisdiction rather than the isolated effect of any single activity that is decisive (Melvin Pine & Co., v. McConnell, 273 App. Div. 218, 223, affd. 298 N. Y. 27). There is no precise measure of the nature or extent of local activities which will render a foreign corporation amenable to process in this State. Each case must be decided on its own particular facts (Tauza v. Susquehanna Coal Co., 220 N. Y. 259, 267; Sterling Novelty Corp. v. Frank & Kirsch Distr. Co., 299 N. Y. 208, 210). Nevertheless, the authorities furnish us with important, significant guideposts. As Lehman, J., stated in Compania Mexicana Refinadora Is. v. Compania Metropolitana de Oleoductos (250 N. Y. 203) at page 209: “ In no two eases are the facts exactly alike. No case has been found where analogy to the problem we must decide is complete. Other decisions are guide posts rather than direct authorities in the solution of the problem.” An essential criterion of doing business here is “ Continuity of action from a permanent locale ” (Sterling Novelty Corp. v. Frank & Kirsch Distr. Co., supra, p. 210; Elish v. St. Louis Southwestern Ry. Co., 305 N. Y. 267, 269, or, as stated in the Tauza case [p. 267], there had to be a business which had “a fair measure of permanence and continuity ”). *967 In Holzer v. Dodge Bros. (233 N. Y. .216, 221) the Court of Appeals supplemented the Tausa rule by adding that the corporation’s business in New York “must be some substantial part of its main business. Nothing short of this will justify such service ”. However, it was established in International Shoe Co. v. State of Washington (326 U. S. 310, 314) and Elish v. St. Louis Southwestern Ry. Co. (supra) that very little additional evidence of the corporation’s presence in activities in the State is necessary to render it amenable to service in this State. Mindful of these authorities, we analyze the facts.
Mutual has no office or permanent locale in New York, but IDS has. The relationship between Mutual and IDS and the nature and extent of the latter’s activities in New York assume, therefore, decisive importance. To sustain the service on Mutual, it must be found that IDS is the agent of Mutual and, as such, transacts business in this State in a systematic and continuing fashion. In this context, it is not material that the contracts between Mutual and IDS designate IDS as an “independent contractor ’ ’. An agent may be an independent contractor; the terms are not mutually exclusive. (See Restatement, Agency 2d, § 2, comment b, p. 13: “ An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal.”) In Melvin Pine & Co. v. McConnell (supra) the corporate representatives in New York of the foreign defendant were “ independent contractors to some extent and maintained their own offices and business facilities ” (273 App. Div. 223); nevertheless, they were held to be agents, whose activities in New York subjected the defendant to the service of process. The claim adjuster in Henriques v. Gauthiod Marine Ins. Co. (205 App. Div. 8); the building manager in Green v. Morning side Hgts. Housing Corp. (13 Misc 2d 124, affd. 7 A D 2d 708); the sales agent in Berner v. United Airlines (3 A D 2d 9, affd. 3 N Y 2d 1003) and in Jaftex Corp. v. Randolph Mills (282 F. 2d 508), and the purchasing agent in Sterling Novelty Corp. v. Frank & Hirsch Distr. Co. (supra) were all independent contractors; yet they were held to be agents, whose operations rendered their principals amenable to service within the State.
In light of Mutual’s vast business activity here, it appears to me that what it seeks is the advantages of doing business here in New York without the disadvantage of subjecting itself to suit within the State. By defining its sole representative in New York as “ an independent contractor ” defendant seeks to place itself in a position where there is no “ live ” person in New York upon whom service can be made. If Mutual desires to have the advantage of doing business in New York, it should assume the *968 burden of litigation arising therefrom (McGee v. International Life Ins. Co., 355 U. S., 220; International Shoe Co. v. State of Washington, 326 U. S. 310, 320, supra).
IDS is the exclusive distributor of the shares of Mutual. It has been acting as such continuously for more than 20 years. The volume of shares sold in New York is very, very substantial. Ordinarily, to be sure, the sale by a corporation of its own shares of stock does not constitute “ doing business ”. But the facts and circumstances here do not present the ordinary case. The stock of Mutual is not sold through a few isolated transactions, which are completed in a matter of days or weeks. Stock-selling is a continuous activity of Mutual, as it is of other mutual funds. It goes on day-in and day-out. Since it is the business of a mutual fund to invest other people’s money for them, its stockholders are, in effect, its customers. By selling its stock to the public, it sells, in effect, its services to the public. The fact that stock orders solicited by IDS in New York must be confirmed by Mutual’s home office in Minneapolis is not decisive here. Although the mere solicitation of orders in New York, which must be accepted outside the State to become contracts, is' not, by itself, sufficient to constitute doing business here, comparatively little additional evidence of the corporation’s activities in the State is necessary to render it amenable to service in the State (Elish v. St. Louis Southwestern Co., supra; Miller v. Surf Properties, 4 N. Y. 2d 475, 480; Farley v. Murray, 15 Misc 2d 164; Jafter Corp. v. Randolph Mills, supra).
In the present case, this additional evidence is amply presented. IDS is the investment manager of Mutual. It has acted in that capacity continuously for more than 20 years. The volume of portfolio securities which IDS buys and sells for Mutual on the New York Exchange each year is huge. It is true that the investment advice is given in Minneapolis and that all investment decisions are “initiated” there, but the decisions thus initiated must be carried out. A great portion are actually carried out on the New York Exchanges. The necessary steps are by no means, as Mutual contends, “ ministerial On the contrary, the selection of the brokers requires a large measure of skill and business judgment, and Mutual’s prospectus depicts in some detail the problems encountered and the advantages achieved. In short, Mutual’s position as an important buyer and seller of securities must be strategically deployed to secure from the brokers here the greatest amount and the highest quality of extra services without extra charge. These transactions with the New York brokers are conducted by IDS on behalf of Mutual, and IDS makes the necessary *969 decisions in the exercise of its business judgment. The actual purchases and sales of securities occur likewise, in large part, here in New York.
Again, although it has been held that the buying and selling of securities on the New York Exchanges would ordinarily not constitute “ doing business ” in New York, yet, again, this is not an ordinary case with which we are now confronted. Mutual, as shown, is an investment company. The purchase and the sale of securities is the very purpose for which Mutual was created and for which its shareholders entrust their moneys to it. Buying and selling securities constitutes an essential part of Mutual’s business, and Mutual has been continuously engaged in it since its organization in 1940.
Mutual cites the reversal by the Appellate Division of Special Term in the case of Waterman Corp. v. Johnston (82 N. Y. S. 2d 655) where Special Term held, a foreign insurance company investing funds in New York, to be doing business here because the financial affairs of an insurance company are an integral part of its operations. The Appellate Division reversed without opinion (Waterman Corp. v. Louisville Fire & Marine Ins. Co., 275 App. Div. 817). While Mutual urges this reversal here as controlling because it is “ strikingly similar to the case at bar ”, I am not so persuaded and do not think it is applicable to the facts here. The principal purpose and service of an insurance company is to provide insurance for its policy holders. The investment of its funds is but a collateral incident of that type of business. This fact, I believe, distinguishes insurance companies from investment companies, whose principal business and purpose is to invest their funds and this partakes of and necessitates daily, constant selling and buying of securities. But, even if the systematic and continuing sale of securities in New York were not enough, per se, to constitute doing business here, it would supply the “ plus ” which, added to the solicitation of shareholders in New York, subjects Mutual to the service of process in this jurisdiction. Mutual places much reliance on the case of Compania Mexicana Refinadora Is. v. Compania Metropolitana de Oleoductos (250 N. Y. 203). The defendants in that case, two Mexican corporations, had appointed a corporate sales agent in New York. The defendants were held not to be engaged in business in New York because the agent transacted its business not for the account of the defendants but of their parent company. These peculiar facts find no analogy in the case at bar.
Further argument is presented by Mutual that the service upon it should be vacated because the transaction out of which *970 this case arises occurred outside of this State; that the plaintiff, a resident of Missouri, has no valid reason for bringing this action here; and that, on balancing the convenience of the plaintiff against the burden upon Mutual of defending this action in New York, this court should deny jurisdiction. These arguments, if factually correct, might carry weight under the £ ‘ federal test of balancing the conflicting interest ”, for under that test, “ the question at once becomes relevant whether action is based upon a liability arising out of the local activities ”. (Bomze v. Nardis Sportswear, 165 F. 2d 33, 35; International Shoe Co. v. State of Washington, supra; Hanson v. Denckla, 357 U. S. 235, 251-252.) This test, however, as recognized in the Bonze case (supra), is not in accordance with the New York rule. In the Tauza case (supra, pp. 268-269), Cardozo, J., speaking for a unanimous court, held that, once a foreign corporation is engaged in business here, ‘ ‘ the jurisdiction does not fail because the cause of action sued upon has no relation in its origin to the business here transacted. # * * The essential thing is that the corporation shall have come into the state. When once it is here, it may be served; and the validity of the service is independent of the origin of the cause of action.” No authoritative decision overruling the Tausa case has been called to my attention nor found by the court’s own research. The trend of decisional law reveals an “ expanding concept of local jurisdiction over foreign corporations ” (Rondinelli v. Chicago, Rock Is. & Pacific R.R. Co., 5 A D 2d 842), and a swing of the pendulum to a more liberal application of the test laid down in the Tausa case (Melvin Pine & Co. v. McConnell, supra). Any doubt as to the constitutional validity of the Tausa rule has been swept aside by Perkins v. Benquet Min. Co. (342 U. S. 437). The ultimate test is whether the nonresident corporation has established sufficient ties and contacts within the State as to make it reasonable and just according to traditional concepts of fair play and substantial justice to make it account in the State for its obligations. The criteria should be neither mechanical nor quantitative but simply that a foreign corporation should be held to the ‘1 obligation ’ ’ of responding to an action to the extent that it has exercised the privilege of conducting activities within the State (International Shoe Co. v. State of Washington, supra). I find this case falls within the ambit of the decisions invoking the doctrine of fair play.
Even if the Federal test were applied, jurisdiction of Mutual would have to be sustained in my opinion. The complaint questions the equivalence of the services performed by IDS to the compensation it received. A substantial part of these serv *971 ices was performed in New York and this furnishes an adequate local contact. Moreover, Mutual is the corporation on whose behalf this action is allegedly brought. It may, therefore, well take a neutral position at the trial and leave to the actual defendants the burden of adducing the evidence in opposition to the plaintiff’s claim. Finally, the reasons supporting the plaintiff’s selection of the New York forum are referred to in my decision, filed simultaneously herewith, of IBS’s motion to dismiss the action on the ground of forum non conveniens (29 Misc 2d 974).
In light, therefore, of all the afore-stated; upon all of the factors, averments, and documentary proof herein presented; upon painstaking study and research of the myriad reported cases applicable to the subject of this motion and those herein cited and referred to, I am of the ultimate conclusion that Mutual is doing business in New York to such an extent and under such circumstances as to make it amenable to the service of process within this State. The cases urged by Mutual in support of its position are not influencing or controlling.
Mutual’s motion to set aside the service on it of the summons and complaint is, therefore, denied. Mutual may serve its answer to the complaint herein within 20 days from the date of service of a copy of this decision and order with notice of entry.