**BOMZE et al. v. NARDIS SPORTS-WEAR, Inc.**

**No. 101, Docket 20782.**

Circuit Court of Appeals, Second Circuit.

Jan. 7, 1948.

Barnet Kaprow and Kramer & Kaprow, all of New York City (David L. Weissman, of New York City, of counsel), for appellants.

Samuel M. Ostroff, of New York City (Charles L. Raskin, of New York City, on the brief), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiffs appeal from an order and judgment quashing the service of the summons and dismissing the complaint on the ground that the plaintiffs had not acquired personal jurisdiction over the defendant, a Texas corporation. The complaint was filed in the state court, and service of the summons (and complaint) was made upon one, Rudolf Pick, as "managing agent" of the local business. The complaint alleged that both the plaintiffs and the defendant made and distributed women's clothes, on which the plaintiffs used the words, "June Arden," as a registered trade-mark, and the word, "Junard," as an unregistered trademark; that they had "offered for sale, and sold in the State of New York and elsewhere in the United States and shipped in interstate commerce," quantities of women's clothes bearing these marks; that since July, 1944, the defendant had been selling "in the State of New York and elsewhere in the United States in interstate commerce," women's clothes with the trademark, "Junard." After the defendant had removed the case for diversity of citizenship (the plaintiffs are citizens of Pennsylvania), it moved to quash the service and dismiss the complaint upon the ground that it was not doing business in New York, and that Pick was not its "managing agent." The supporting and opposing affidavits used upon the motion being in conflict, the judge, on March 2, 1945, directed a reference to a special master to take testimony and report; and on October 22, 1945, the master filed a report, finding that the defendant did not do business in the Southern District of New York, that Pick was not its "managing agent," and that for these reasons the service should be quashed and the complaint dismissed. On June 25, 1946, the judge so ordered, and on July 9, 1946, a judgment was entered in favor of the defendant for costs. In the order of reference, the judge had provided that the expenses of the hearing, if the defendant was unsuccessful, might be borne by the party who eventually failed in the action; and the plaintiffs' appeal is from this order as well.

The facts, so far as relevant, are as follows. On December 18, 1942, the defendant entered into an agreement with three persons—Sorter, Hertz and Pick, then doing business as "West Coast Sales Company"—by which it appointed them its agents, "to solicit orders and to further the sale for it of women's sportswear manufactured by it," subject to "written approval and acceptance" at such prices and upon such conditions as it should authorize in writing: the power to accept orders or assume obligations being absolutely reserved to it. They were to maintain a show-room for the display of the defendant's goods, and to employ their own assistants; and they were to be responsible for employer's liability, workmen's compensation, unemployment insurance, and other liabilities of the kind. As compensation they were to have seven per cent of the net sale price upon all orders accepted by the defendant, and three and one-half per cent upon any merchandise sold by them in any showrooms set up by them in outside territory. The defendant agreed to pay $100 a week advance commissions for the first twelve weeks, $100 a month for the first six months toward the expenses of maintaining the show-room, and $125 rent for the New York show-room for the first month, January, 1943; but except for these the agents were to pay all their expenses out of their commissions. Sorter, Hertz and Pick organized a company, known as the Sopic Corporation, which took over the contract, and later they filed a certificate allowing them to do business as the "Sopic Trading Company," under which name after June, 1944, they took back the business. They leased a show-room in Manhattan, paid the rent, employed two salesmen to solicit orders, and two office girls; they carried on altogether without interference from the defendant, paid for the telephone, outfitted the office, paid all taxes and similar liabilities; and secured orders in 1944 amounting to $400,000—which was about nine per cent of the defendant's total business. Of the three Pick was the person in charge. The judge held that the rule still obtained that the solicitation of orders alone did not subject a foreign corporation to service in personam in a transitory action; and that there were not enough additional activities to take the case out of this doctrine.

By removal a defendant does not lose his right to challenge the invalidity of the service in the state court;[1] and thus the first question is whether the service was valid under the New York decisions. If we conclude that it was not, of course the case ends; but, if we conclude that it was, there arises the second question: i. e. whether the service was valid under the Constitution.[2] This approach is the proper one, because the law of New York may not extend to suitors' access to its courts against foreign corporations as amply as it has power to do under the Constitution. In the first inquiry we need not go back of Judge Cardozo's opinion in Tauza v. Susquehanna Coal Co.,[3] for that has been accepted as the basis of the later decisions. The test there set was the familiar one: whether the corporation was "present" in the state by virtue of those activities which it there set in motion. How extensive these must be to make the corporation "present" was left at large in that case, as it had been before and has been since; for in the last decision,[4] Conway, J., after summing up those local activities of the corporation—Vanguard Films, Inc.—which, he held, proved it to have been " 'here' within the meaning of the Tauza Case," made no attempt to lay down any general proposition from which that conclusion could be deduced. Nor had any of the intervening decisions attempted to do so.[5] It would have been possible from some of the language in Bagdon v. Philadelphia & Reading Coal & Iron Co.,[6] to infer that, if the liability in suit arises out of the local activities, it is not necessary to go further, except to show that these were continuous. However, we understand that since Tauza v. Susquehanna Coal Co., supra,[7] the law of New York has been that a foreign corporation is either "present," or it is not; and once it is found to be "present," it becomes subject to process, regardless of whether the particular liability in suit has arisen out of the activities which collectively constitute the "presence." How far this has been a reflection of what the New York courts suppose to be the constitutional limit of their power is not clear. In Lillibridge, Inc. v. Johnson Bronze Co., supra,[8] Finch, J., declared that the state courts should take the federal decisions as their absolute standard, positive as well as negative; but, when the Court of Appeals affirmed the decision, it wrote no opinion.

If the state courts do take the Supreme Court decisions in both senses: that is, if they regard the inquiry, how far they may go, as coalesced with the inquiry, how far they will go, International Shoe Co. v. Washington,[9] has effected a change. The Supreme Court there declared that the corporation's "presence" was to be determined by balancing the opposed interests: the convenience of the obligee against the burden upon the corporation. That is a test not different in kind from that which has been repeatedly used, when the inquiry is whether it will "unduly burden" interstate commerce to fetch a corporation, engaged in such commerce, from the place of its principal activities to defend the action. If that be the test, the question at once becomes relevant whether the action is based upon a liability arising out of the local activities; for it is almost always less burdensome to subject a corporation to the defense of actions so arising than to those arising elsewhere.[10] Indeed, probably some such notion is at the basis of those decisions which permit a state to subject to process

---

[1] Lambert Co. v. Baltimore & O. R. Co., 258 U.S. 377, 382, 42 S.Ct. 349, 66 L.Ed. 671.

[2] Chipman v. Jeffery Co., 251 U.S. 373, 379, 40 S.Ct. 172, 64 L.Ed. 314; Lillibridge, Inc. v. Johnson Bronze Co., 220 App.Div. 573, 222 N.Y.S. 130, affirmed without opinion, 247 N.Y. 548, 161 N.E. 177.

[3] 220 N.Y. 259, 115 N.E. 915.

[4] Chaplin v. Selznick, 293 N.Y. 529, 58 N.E.2d 719.

[5] Holzer v. Dodge Bros., 233 N.Y. 216, 135 N.E. 268; Lillibridge, Inc. v. Johnson Bronze Co., supra, 247 N.Y. 548, 116 N.E. 177; Gaboury v. Central Vermont R. Co., 250 N.Y. 233, 165 N.E. 275.

[6] 217 N.Y. 432, 437, 111 N.E. 1075, L. R.A.1910F, 407, Ann.Cas.1918A, 389.

[7] 220 N.Y. 259, 115 N.E. 915.

[8] 220 App.Div. 573, 222 N.Y.S. 130.

[9] 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057.

[10] Old Wayne Life Ass'n v. McDonough, 204 U.S. 8, 22, 27 S.Ct. 236, 51 L.Ed. 345; Simon v. Southern Railway, 236 U.S. 115, 130–132, 35 S.Ct. 255, 59 L.Ed. 492.

in personam transients who, while within its borders, have incurred a liability under its laws.[11] In the case at bar such a rule would answer any objections to jurisdiction, for the complaint alleges that the defendant has sold goods in New York bearing the trade-mark, "Junard"; and, if so, the wrong was pro tanto a direct consequence of the continuous New York solicitation of orders. Nevertheless, we hesitate to say that the New York courts will occupy the new enclave, now opened to them by International Shoe Co. v. Washington, supra;[12] and, until they do, we see no other course but to compare the facts in the case at bar with those which existed in the bellwether decisions of the state, and to appraise—a more candid word would be to guess at—the importance of any differences. This we shall try to do.

In Tauza v. Susquehanna Coal Co., supra,[13] the foreign corporation had an agent in charge of the New York office who employed eight salesmen, over whom he had the entire direction. The corporation kept a bank account in New York out of which all office expenses were paid, including salaries and rent. This managing agent had no power to close any contracts; he merely solicited orders and sent them to the home office for acceptance, but he used the corporation's name upon the door and elsewhere, as he desired. The differences are that in the case at bar Pick was obliged to pay all expenses out of his commisssions, that he employed fewer assistants and salesmen, and that the local business is not so large. His use of the defendant's name on the door, in public directories, in the telephone book, and on stationery was obviously with the defendant's acquiescence; Gold, its president went to the office not infrequently, and the defendant actually furnished the stationery. We cannot think it crucial that the principal pays the salaries of the salesmen, the rent and the other expenses incidental to the business, instead of fixing the commissions high enough to cover these charges; and indeed in the only case in which the question has arisen in New York,[14] that was the ruling. A local bank account is obviously necessary if the principal is to pay the expenses itself.

In Chaplin v. Selznick, supra,[15] Vanguard Films, Inc. had a New York office where there were only three employees, whose duties were to look over such scripts and other literary material as came in, and to forward to the home office any that appeared promising. The corporation paid all the expenses, however, and kept a bank account for the purpose. The majority dwelt with some emphasis upon the corporation's payment of an "occupancy tax," arguing that it could not well assert that it was not "present" after such an implied admission. Yet it would seem that to pay the charges imposed upon a resident employer —employer's liability, unemployment and the like—which Pick paid, as much justifies the inference of "presence" as the payment of an "occupancy tax," though verbally the argument is not so strong. If it is as strong in substance, and if, as we think, it makes no difference whether the principal or the agent pays the expenses of the business, so long as they come out of the same pocket in the end, the "occupancy tax" is not an important distinction here. Nor is it one that on one occasion Vanguard Films, Inc. tried unsuccessfully to borrow a large sum from a New York bank. What we have just said as to Tauza v. Susquehanna Coal Co., supra,[16] applies to this decision; the distinctions between the situation there and here seem to us insubstantial.

On the other hand we do find it difficult to reconcile Lillibridge, Inc. v. Johnson Bronze Co., supra,[17] for we cannot see that it was important that the agent worked for several principals. In the end any decision must seem like the fiat of a piepowder

[11] Kane v. New Jersey, 242 U.S. 160, 37 S.Ct. 30, 61 L.Ed. 222; Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L. Ed. 1091; Young v. Masci, 289 U.S. 253, 53 S.Ct. 599, 77 L.Ed. 1158, 88 A.L.R. 170; Henry L. Doherty & Co. v. Goodman, 294 U.S. 623, 55 S.Ct. 553, 79 L. Ed. 1097.

[12] 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057.
[13] 220 N.Y. 259, 115 N.E. 915.
[14] Johnson v. Pacific Steel Boiler Corporation, 132 Misc. 735, 739, 230 N.Y. S. 441.
[15] 293 N.Y. 529, 58 N.E.2d 719.
[16] 220 N.Y. 259, 115 N.E. 915.
[17] 247 N.Y. 548, 161 N.E. 177.

court. That will indeed be to some measure true, even though the federal test is applied of balancing the conflicting interests; but at least that will serve to center the inquiry upon those considerations which count with the parties, and to remove it from that world of abstractions—drawn from the analogy of arrest under a capias—in which it has hitherto so helplessly floundered. Our own decisions need not detain us. In Deutsch v. Hoge,[18] the extract from Judge Goddard's opinion says among other things that the "defendants did not conduct a regular course of business in New York." Whether by this he meant that the agent's work was intermittent and sporadic, or whether it was merely his legal conclusion from the evidence is not clear. In any event the majority cited only federal decisions, and apparently proceeded on the assumption that these were conclusive; International Shoe Co. v. Washington, supra,[19] had not been decided and might have resulted in an opposite conclusion. The same is true of Davega, Inc. v. Lincoln Furniture Mfg. Co.,[20] where also we did not distinguish between the state and the federal law. In conclusion we hold that the defendant was doing enough business in New York to satisfy the state decisions; and that, since the cause of action arose—at least as to New York sales—out of those activities which made the corporation "present," any federal question is set at rest.

[5, 6] There remains the question whether the service on Pick was valid under the New York Civil Practice Act,[21] strictly a question of state law. This is in two parts: whether Pick was a "managing agent" at all; whether the plaintiffs had exercised due diligence to ascertain that the persons mentioned in subdivision one of § 229 were not available for service. As to the first issue, Pick was concededly in charge of the local business, when Gold, the president, was not in New York, which was only occasionally. That being true, Pick was the "managing agent," as the statute uses the word; for we understand the New York courts to hold that, whatever activities make the corporation "present," the agent in charge of those activities is the "managing agent" pro hac vice.[22] The master also found that the process servers did not exercise due diligence to ascertain the absence from New York of the officers mentioned in subdivision one. Two process servers testified: Wechsler and Kruger. Wechsler said that he went to Pick's office on December 28 and 29, 1944, and asked whether any officers of the defendant were there; and that on one occasion anyway he was told that they were out of town. The master doubted this testimony, because he thought that if Wechsler had been there, he would have served Pick as soon as he heard that the officers were out of town. Be that as it may, on January 5, 1945, Kruger undoubtedly did appear, asked to see an officer or a director, and was told that they were all in Dallas and that Pick was in charge. This is to some extent confirmed by the affidavit of one, Satz, that Kruger was told that no officer "was around." The master apparently believed Kruger; but he thought that due diligence called for further inquiry. The last is not a finding of fact, and we cannot agree with the conclusion. The statute does not impose on a plaintiff the duty of waiting till some officer appears; he may choose his own time to sue. (We mention, merely to leave the answer open, the possibility of a situation in which the officers are regularly present, but the plaintiff deliberately selects an occasion when he knows that all will be away.) There is no such evidence here; so that all the plaintiffs had to do was to make reasonable effort, when they did seek to serve the process, to serve any officer or director who was then within the state. To go to the place of the local business, and there to ascertain from the person in charge that all are 1500 miles away, was enough. Indeed, the master's rulings result in a curious inconsistency: he discredited Wechsler because he thought Wechsler would have served Pick

---

18 2 Cir., 146 F.2d 201, 202.
19 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057.
20 2 Cir., 29 F.2d 164.
21 § 229(3).
22 Tuchband v. Chicago & A. R. Co.,

115 N.Y. 437, 22 N.E. 360; Palmer v. Chicago Evening Post Co., 85 Hun 403, 406; Russell v. Washington Life Ins. Co., 62 Misc. 403, 409, 115 N.Y.S. 950; Jackson v. Schuylkill Silk Mills, 92 Misc. 442, 445, 156 N.Y.S. 219.

upon getting precisely that information, which, when Kruger acted upon it, he found to be insufficient diligence. We hold the service valid.

■ We read the interlocutory order as leaving it to the discretion of the trial judge at the conclusion of the cause to include the costs and disbursements of this interlocutory proceeding within the other costs, and impose them as to him may then seem fair. We think that this was right; this proceeding was a step in the defence of the action, and the trial judge may conclude that the claim as a whole was so destitute of merit as to make it proper to charge the cost of every step in it against the plaintiffs who stirred up the controversy. We do not suggest that he ought to do so; but it is proper to leave his hands free.

Interlocutory order affirmed.

Order quashing summons and dismissing complaint reversed.