Charles M. FRALEY, Plaintiff,

v.

The CHESAPEAKE AND OHIO RAILWAY COMPANY, Defendant.

Civ. A. No. 66–415.

United States District Court
W. D. Pennsylvania.

Jan. 23, 1969.

McArdle & McLaughlin, Pittsburgh, Pa., for plaintiff.

Mercer & Buckley, Pittsburgh, Pa., for defendant.

## OPINION

DUMBAULD, District Judge.

The question for decision here is whether, upon the record before us as developed after full opportunity for discovery,[1] the activities of the Chesapeake and Ohio Railway Company within the Western District of Pennsylvania are sufficiently substantial and continuous as to constitute "doing business" within the meaning of 45 U.S.C. § 56[2] so as to justify litigation within said district of a personal injury case arising in another State, and involving a non-resident plaintiff.

The circumstances under which a Court may properly adjudicate lawsuits against a corporation created under the law of a State other than that in which the court sits have long been the subject of extensive judicial discussion and much problematical philosophizing. United States v. Scophony Corp., 333 U.S. 795, 804, 819–820, 68 S.Ct. 855, 92 L.Ed. 1091 (1948).

Thus in the first case in which the name of the writer of this opinion was enshrined in the federal reports, United States v. Aluminum Co. of America, 20

---

1. The discovery permitted pursuant to the Court of Appeals decision of June 14, 1968 embraced also the railroad's activities at its Philadelphia office. 397 F.2d at 4. Such activities would not strengthen plaintiff's case in the Western District of Pennsylvania, however, in view of the wording of 45 U.S.C. § 56, set forth in note 2, infra. The statute expressly requires doing business *in the district*, not the State, of the forum. To treat the entire State of Pennsylvania as the critical area would be to fall into the error into which our opinion of February 27, 1967 supposedly fell, of applying a State law criterion (397 F.2d at 3–4), which would be applicable only in a diversity case. Partin v. Michaels Art Bronze Co., 202 F.2d 541, 543–544 (C.A.3, 1953); Bomze v. Nardis Sportswear, 165 F.2d 33, 35 (C.A.2, 1948).

2. " * * * [an action] may be brought * * * *in the district* of the residence of the defendant, or in which the cause of action arose, or *in which the defendant shall be doing business* at the time of commencing such action." (Italics supplied). The present wording incorporates an amendment effected by the Act of April 5, 1910, 36 Stat. 291.

F.Supp. 13, 15–16 (S.D.N.Y.1937), the court dealt with the distinction between "doing business" and "transacting business", the latter term being the criterion embodied in the special venue provision for antitrust cases contained in 15 U.S.C. § 22.[3]

In connection with research for that case, we recollect reading with fascination the memorable opinion of Judge Learned Hand in Hutchinson v. Chase & Gilbert, 45 F.2d 139, 140–142 (C.C.A. 2, 1930), and attempting to tread in his footsteps from tuft to tuft across the morass of doctrine and decision.

Perhaps there is no better summary of the matter than what he there wrote:

The theory of personal jurisdiction in an action in personam is, ordinarily at any rate, derived from the power over the defendant, consequent upon his presence within the state of the forum. McDonald v. Mabee, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608, L.R.A.1917F, 458. The service of a capias subjects him de facto to such commands as its courts may utter, though in its stead a notice will usually serve. Such a theory is not really apposite to a corporation, however conceived, and it is only by analogy that it can be used. So long as it was thought of as a fictitious personality, created by the state of its origin, there were logical difficulties—or at least there were thought to be,—in treating it as existent outside the limits of that state. Bank of Augusta v. Earle, 13 Pet. 519, 10 L. Ed. 274. As to jurisdiction, the express consent of a corporation to be sued elsewhere avoided its territorial limitations * * * and * * * this has been extended to cases where the corporate activities within the foreign state are such as empower that state to exact such a consent. * * *

It scarcely advances the argument to say that a corporation must be "present" in the foreign state, if we define that word as demanding such dealings as will subject it to jurisdiction, for then it does no more than put the question to be answered. Indeed, it is doubtful whether it helps much in any event. It is difficult, to us it seems impossible, to impute the idea of locality to a corporation, except by virtue of those acts which realize its purposes. The shareholders, officers and agents are not individually the corporation, and do not carry it with them in all their legal transactions. It is only when engaged upon its affairs that they can be said to represent it, and we can see no qualitative distinction between one part of its doings and another, so they carry out the common plan. If we are to attribute locality to it at all, it must be equally present wherever any part of its work goes on, as much in the little as in the great.

When we say, therefore, that a corporation may be sued only where it is "present", we understand that the word is used, not literally, but as shorthand for something else. It might indeed be argued that it must stand suit upon any controversy arising out of a legal transaction entered into where the suit was brought, but that would impose upon it too severe a burden. On the other hand, it is not plain that it ought not, upon proper notice, to defend suits arising out of foreign transactions, if it conducts a continuous business in the state of the forum. At least, the Court of Appeals of New York seems still to suppose this to be true, in spite of the language in Old Wayne Mut. Life Ass'n v. McDonough, 204 U.S. 8, 27 S.Ct. 236, 51 L.Ed. 345, and Simon v. So. Ry., 236 U.S. 115, 35 S.Ct. 255, 59 L.Ed. 492. Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 115 N.E. 915. And see Missouri, K. & T. Ry. v. Reynolds, 255 U.S. 565, 41 S.Ct. 446, 65 L.Ed. 788. But a single transaction is certainly not enough, whether a substantial business subjects the corporation to jurisdiction generally, or only as to local transactions. There must be some continuous dealings in the state of the forum; enough to demand a trial away from its home.

---

3. On this point see also *Scophony*, 333 U.S. at 802–810, 68 S.Ct. 855.

This last appears to us to be really the controlling consideration, expressed shortly by the word "presence", but involving an estimate of the inconveniences which would result from requiring it to defend, where it has been sued. We are to inquire whether the extent and continuity of what it has done in the state in question makes it reasonable to bring it before one of its courts. Nor is it anomalous to make the question of jurisdiction depend upon a practical test. This for example is avowedly the case as to corporations engaged in interstate commerce. Davis v. Farmers' Co-operative Equity Co., 262 U.S. 312, 43 S.Ct. 556, 67 L.Ed. 996. No doubt there are governmental reasons for protecting such corporations from local interference; yet, as mere matter of municipal law, the loss and inconvenience to ordinary companies from being sued wherever they may chance to have any dealings whatever, cannot properly be ignored, and may constitute a test of jurisdiction, just as they do of venue, really a kindred matter. If so, it seems to us that nothing is gained by concealing what we do by a word which suggests an inappropriate analogy, that is, the presence of an individual who may be arrested and compelled to obey. This does not indeed avoid the uncertainties, for it is as hard to judge what dealings make it just to subject a foreign corporation to local suit, as to say when it is "present", but at least it puts the real question, and that is something. In its solution we can do no more than follow the decided cases.

Possibly the maintenance of a regular agency for the solicitation of business will serve without more. The answer made in Green v. C., B. & Q. R. R. Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916, and People's Tob. Co. v. Amer. Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587, Ann.Cas.1918C, 537, perhaps becomes somewhat doubtful in the light of International Harvester Co. v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479, and, if it still remains true, it readily yields to slight additions. In Tauza v. Susquehanna Coal Co., supra, there was no more, but the business was continuous and substantial. Purchases, though carried on regularly, are not enough (Rosenberg Co. v. Curtis Brown Co., 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372), nor are the activities of subsidiary corporations (Peterson v. Chicago, R. I. & P. Ry. Co., 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841; Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634), or of connecting carriers (Philadelphia & Read. Co. v. McKibbin, 243 U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710). The maintenance of an office, though always a make-weight, and enough, when accompanied by continuous negotiation, to settle claims (St. Louis S. W. Ry. v. Alexander, 227 U.S. 218, 33 S.Ct. 245, 57 L.Ed. 486), is not of much significance (Davega, Inc., v. Lincoln Furniture [Mfg.] Co., 29 F. (2d) 164 (C.C.A. 2). It is quite impossible to establish any rule from the decided cases; we must step from tuft to tuft across the morass.

Further elaboration was furnished by Mr. Chief Justice Stone in International Shoe Co. v. State of Washington, 326 U.S. 310, 315–321, 66 S.Ct. 154, 90 L.Ed. 95 (1945), upholding the right of the State of Washington to tax the shoe company's activities in the State and also to subject it to a suit to recover the tax. The demands of due process, he said, may be met by such contacts of a foreign corporation with the forum state as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there.[4] Stated differently, "due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it

---

4. 326 U.S. at 317, 66 S.Ct. 154. Relevant in this connection, he further said, quoting Judge Hand in Hutchinson v. Chase & Gilbert, is an "estimate of the inconveniences" which would be imposed on the corporation by a trial away from its "home" or principal place of business. Ibid.

such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " 326 U.S. at 316, 66 S.Ct. at 158.

Judge Hand regarded the *International Shoe* test as one of "balancing the conflicting interests", and believed that it served "to center the inquiry upon those [practical] considerations which count with the parties, and to remove it from that world of abstractions—drawn from the analogy of arrest under a capias —in which it has hitherto so helplessly floundered." Bomze v. Nardis Sportswear, 165 F.2d 33, 37 (C.A. 2, 1948).

In a latter case, Kilpatrick v. Texas & Pacific Ry. Co., 166 F.2d 788 (C.C.A. 2, 1948), Judge Hand more explicitly attributed additional revolutionary scope to the *International Shoe* case. Plaintiff very properly places great reliance on this opinion of Judge Hand, for he squarely states (166 F.2d at 792) that "the continuous solicitation of business was itself 'doing business' under § 6." [45 U.S.C. § 56]

However, while yielding to none in our boundless veneration and respect for Judge Learned Hand, we are unable to accept his interpretation of *International Shoe* or his reasoning in *Kilpatrick,* because, *inter alia,* it conflicts with his own prior reasoning in *Chase & Gilbert.*

In *Kilpatrick* Judge Hand held, disregarding contrary opinions by two other eminent jurists (Judges Rifkind and Medina) that corporate "presence" for purposes of jurisdiction was no longer equivalent to or identical with "doing business".

According to Judge Hand, "in 1945 the Supreme Court [in *International Shoe*] so restated the whole doctrine of corporate 'presence' as to make it no longer possible to hold it identical with 'doing business' under § 6." 166 F.2d at 790.

*International Shoe,* in Judge Hand's view, gave

a new explanation to corporate "presence", for it held that in order to determine that question the court must balance the conflicting interests in-

volved: i. e., whether the gain to the plaintiff in retaining the action where it was, outweighed the burden imposed upon the defendant; or vice versa. *That question is certainly indistinguishable from the issue of "forum non conveniens."* Therefore, as we understand it, when a railroad is "doing business" continuously outside the state of its incorporation, § 6 makes irrelevant any question of "forum non conveniens"; but, when a railroad or any other corporation is doing business continuously outside the state of its incorporation, that "presence" which subjects it to personal service in actions for which no venue is specifically provided, depends upon the issue of "forum non conveniens".

The necessity that the corporation shall be "present" at all arises from the territorial limitations of the power of a state—legislative, executive or judicial—in dealing with the legal relations of a person not in allegiance. In the case of individuals it has of course been long recognized that the defendant must, ordinarily, be subject to a capias when the action is begun, if a judgment against him in personam is to be valid. The same doctrine applies to corporations; but, since a corporation—whether it be regarded as a fabricated jural person, or an aggregate—is not identical with its members, *spatial attributes can be ascribed to it only where its communal purposes are realized. It cannot be present in a place where none of its activities take place, and, literally at any rate, it is present wherever any of them do take place.* It would therefore seem that, so far as it must be "present" in order to satisfy the territorial limitation upon the powers of a court when acting in personam, *it should be enough constitutionally that it shall have extended its activities into the territory where that court's process runs. If that be true, the question whether it must stand trial in the particular forum which the plaintiff has chosen is, as we have said, identical with the*

*plea of "forum non conveniens".* Since the Supreme Court has held in the decisions we have just mentioned,[5] that that plea is not permissible in an action under the Federal Employers Liability Act, and *the defendant was "present" in the only sense that a corporation can be present,* the action well lay. (Italics supplied)

We find three fundamental defects in what Judge Hand here says.

In the first place, it is wrong to equate the *International Shoe* test of "fair play and substantial justice" with the doctrine of *forum non conveniens,* which rests upon a basis of convenience and expediency. The "fair play" test is one of determining whether the contacts with the forum are sufficient to justify jurisdiction. The doctrine of *forum non conveniens* deals with the propriety of exercising jurisdiction admittedly established and existing. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506–508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). As Mr. Justice Jackson there said, the doctrine of *forum non conveniens* comes into play only when there are at least two forums in which the defendant is *ex hypothesi* amenable to process; "the doctrine furnishes criteria for choice between them." 330 U.S. at 506–507, 67 S.Ct. at 842.

To confuse the "fair play" test with *forum non conveniens* is as if one were to confuse the rule regarding the sufficiency of a plaintiff's evidence to go to a jury with the rule that the burden of proof is met by a preponderance of the evidence. Evidence might well preponderate over that conflicting with it but still be inadequate and insufficient to go to the jury.

The "balancing of interests" in *forum non conveniens* is a determination based entirely upon expediency. It may be governed by factors of administrative convenience, such as the comparative docket congestion in the respective jurisdictions involved. 330 U.S. at 508, 67 S.Ct. 839.

But the *International Shoe* test calls for a determination based upon issues relating to fair play and substantial justice. Is the nexus of contacts between the defendant and the forum sufficiently substantial and continuous that the defendant ought to be amenable to judicial authority there? The question is not whether it is *convenient,* but whether it is *fair,* to require the defendant to submit to the adjudicatory procedures of the forum.

In the second place, Judge Hand's *Kilpatrick* reasoning conflicts with his *Chase & Gilbert* reasoning. In *Kilpatrick* he adopts a literal interpretation of the corporate "presence" doctrine, and says that a corporation is present wherever *any* of its activities take place; and hence that in a FELA case in a jurisdiction where there has been solicitation and nothing more "the defendant was 'present' in the only sense that a corporation can be present." 166 F.2d at 791.

But in *Chase & Gilbert* Judge Hand acknowledged that in discussions of corporate presence as a basis for jurisdiction "the word is used, not literally, but as shorthand for something else" ; that is to say "whether the extent and continuity of what it has done in the state

---

5. Judge Hand is here referring to Baltimore & O. R.R. Co. v. Kepner, 314 U.S. 44, 62 S.Ct. 6, 86 L.Ed. 28 (1941), and Miles v. Ill. Central R.R. Co., 315 U.S. 698, 62 S.Ct. 827, 86 L.Ed. 1129 (1942), which held that a suit brought in a forum authorized by the venue provision of 45 U.S.C. § 56 could not be enjoined under general equity powers as being burdensome or vexatious litigation. As stated by Judge Hand,

the Supreme Court held that, once a railroad "did business" in any jurisdiction, § 6 subjected it to personal service regardless of how much inconvenience or expense was involved in trying the action far away from the scene of the accident and the residence of all the defendant's witnesses. It followed that a plaintiff might, as here, select that jurisdiction which promised the richest harvest, and the railroad must meet him on his chosen ground. These decisions unconditionally eliminated from § 6 any considerations of "forum non conveniens."

in question makes it reasonable to bring it before one of its courts." 45 F.2d at 141. Judge Hand's test of "reasonableness" is thus the equivalent of the "fairness" test adopted by the Supreme Court in *International Shoe* which cited his *Chase & Gilbert* opinion in support of the proposition that "presence" simply symbolizes "those activities * * * which courts will deem sufficient to satisfy the demands of due process". 326 U.S. at 317, 66 S.Ct. at 158. The Court then immediately formulates the test of "reasonableness", saying that "Those demands may be met by such contacts * * * as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit."

This is far from saying that *any* activity of the corporation within the forum suffices to establish its "presence" there for the purpose of subjecting it to suit. It remains true after 1945 as before that talk of "presence" as a basis for jurisdiction is, as Judge Hand recognized in *Chase & Gilbert*, simply "shorthand" for something else, namely the "reasonableness" or "fair play" test explicitly avowed in *International Shoe*.

In the third place, accordingly, it follows that "presence", so defined and understood, is still the equivalent of "doing business";[6] and that "doing business" still requires more than the "transacting business" standard in the antitrust venue provisions.[7]

Furthermore, it may be observed that the "fair play" standard has crystallized out several more specific applications. For example we believe that one such subsidiary rule is that ordinarily "fair play" requires that any litigation arising out of activities actually conducted in the forum should be justiciable there. Many cases establish this doctrine. McGee v. Int. Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *International Shoe*, 326 U.S. at 319, 66 S.Ct. 154; Bomze v. Nardis Sportswear, 165 F.2d at 35; *Kilpatrick*, 166 F.2d at 791, where Judge Hand illustrates the proposition by saying that, if "a piepowder court pro hac vice" could have been set up at the moment when the original business was done out of which the litigation arose, that tribunal of the forum would certainly have been competent to adjudicate the matter.

In our judgment, another specific crystallization from the "reasonableness" or "fair play" test is the familiar rule that "mere solicitation without more" does not confer jurisdiction. This is a federal rule, established by federal courts, in cases arising under federal law (usually the FELA itself). This rule was recognized by Judges Rifkind and Medina in the Second Circuit in Trizna v. New York, C. & St. L. R. R. Co., 57 F.Supp. 484, 485 (S.D.N.Y.1944); and Pickthall v. Anaconda Copper Mining Co., 73 F. Supp. 694, 698 (S.D.N.Y.1947).[8] In the third Circuit Judges Kraft and Wood have enunciated the rule. Vereen v. Chicago, M., St. P. and P. R. R. Co., 209 F.Supp. 919, 920 (E.D.Pa.1962); Greenawalt v. Reading Co., 209 F.Supp. 954, 955 (E.D.Pa.1962).

In our own order of May 25, 1966, we expressed the opinion "that an extra-State interstate rail carrier cannot be

---

6. As verbal formulations embodying legal fictions, perhaps both terms should be avoided as obsolete (see 355 U.S. at 222, 78 S.Ct. 199) and replaced by language more clearly embracing the "fair play and substantial justice" or "reasonableness" test. But in the FELA venue provision of 45 U.S.C. § 56 Congress uses the words "doing business", and we must therefore accord them their proper significance as incorporating the "fair play" standards explicitly avowed in *International Shoe*.

7. See note 3, supra.

8. These are cases repudiated by Judge Hand in *Kilpatrick*, 166 F.2d at 790. In *Pickthall* Judge Medina held that presence of the principal executive offices within the district conferred jurisdiction. He justly noted also that "The doctrine of *forum non conveniens* is not involved." 73 F.Supp. at 699.

**1200**

considered as doing business, for purpose of jurisdiction of an extra-State tort arising out of its operations as a carrier, in a State where it does not conduct rail operations (as distinguished from solicitation, advertising, and the like)."

We deferred decision then upon defendant's motion to dismiss until the relations between defendant and the B. & O., which does operate in Pennsylvania, could be determined. We then concluded that defendant merely had stock ownership of the B. & O. and that their carrier business and other relationships were scrupulously segregated and that there was no occasion to "pierce the corporate veil" by reason of the doctrine of *alter* ego. Fraley v. Chesapeake & O. Ry. Co., 264 F.Supp. 184, 185 (W.D. Pa.1967), citing Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 336–337, 45 S.Ct. 250, 69 L.Ed. 634 (1925). We also found no basis for holding defendant as being a company engaged in equipment rental,[9] as distinguished from the transportation business.

The Court of Appeals subsequently directed a wider range of discovery than had been prescribed under our order of May 25, 1966, but did not pass upon the question whether "mere solicitation without more" suffices to confer jurisdiction. That question must now be faced, since completion of plaintiff's discovery has not disclosed any substantial activities other than solicitation.[10]

We believe that our opinion as expressed in the order of May 25, 1966 is a correct statement of federal law.

Judge Hand himself in Bomze (165 F.2d at 35) recognized that the *International Shoe* test, as he interpreted it, "is a test not different in kind" from that used to determine whether litigation will unduly burden interstate commerce. Therefore the cases on that topic to which we adverted in note 1 of 264 F. Supp. at 184 must be considered as applicable, and as announcing valid rules of federal law.[11]

The leading case on solicitation without more is Green v. Chicago, B. & Q. Ry. Co., 205 U.S. 530, 533–534, 27 S.Ct. 595, 51 L.Ed. 916 (1907). Plaintiff there sued a western railroad in the Eastern District of Pennsylvania. The Court acknowledged "that the defendant was doing there a considerable business of a certain kind, although there was no carriage of freight or passengers. * * " But "The business shown in this case was in substance, nothing more than that of solicitation. Without undertaking to formulate any general rule defining what transactions will constitute 'doing business' in the sense that liability to service is incurred, we think that this is not enough * * *. This view accords with several decisions in the lower Federal courts."

The *Green* doctrine was squarely endorsed by the eminent Mr. Justice Brandeis, who wrote the opinion of the Court in Philadelphia & Reading Ry. Co. v. McKibbin, 243 U.S. 264, 268, 37 S.Ct. 280, 61 L.Ed. 710 (1917).[12] It was again

---

**9.** It was in connection with such putative equipment rental business (not defendant's operations as an interstate rail carrier) that we made an unfortunate reference to the "series of acts for economic gain" test under Pennsylvania law, which led the Court of Appeals to suppose that we "regarded Pennsylvania law as controlling" in determining the question of jurisdiction. Fraley v. Chesapeake & O. Ry. Co., 397 F.2d 1, 3–4 (C.A. 3, 1968). Since diversity of citizenship does exist in the case at bar, if our conclusion as to the rental business had been different, could the FELA claim have been tried, though

not "pendent" to any claim asserted as arising out of the rental business?

**10.** Plaintiff at argument referred to Interrogatories Nos. 39, 46, and 57a as showing additional activities relating to transmission of complaints or funds. These disclose nothing of substance.

**11.** On this point, see Davis v. Farmers' Co-operative Equity Co., 262 U.S. 312, 43 S.Ct. 556, 67 L.Ed. 996 (1923), quoted in note 12 infra.

**12.** In Davis v. Farmers' Co-operative Equity Co., 262 U.S. 312, 315, 317, 43 S.Ct. 556, 67 L.Ed. 996 (1923), Justice

cited with approval in People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 87, 38 S.Ct. 233, 62 L.Ed. 587 (1918) with respect to a tobacco company, notwithstanding the fact that in a prior case. involving sale of merchandise, Int. Harvester Co. v. Com. of Ky., 234 U.S. 579, 587, 34 S.Ct. 944, 58 L.Ed. 1479 (1914), it was held that the defendant was liable to suit because in addition to solicitation the merchandise was delivered within Kentucky in response to orders. But, as Judge Cardozo said, commenting on the *Green* case in Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 266, 115 N.E. 915 (1917): "The orders did not result in a continuous course of shipments from Illinois to Pennsylvania. The activities of the ticket agent in Pennsylvania brought nothing into the state."

Attention is thus drawn to the peculiar nature of the railroad industry. The importance of the "solicitation without more" doctrine to railroading, as a long-settled rule in reliance upon which the customs and practices of that industry have been established, must be emphasized.[13]

The idiosyncratic nature of railroads is a well-marked characteristic, readily observable in the trial of FELA cases. The vocabulary, idiom, and habits of those engaged in railroad work are distinctive and quite different from those of workers in other fields of activity. For that matter, the maintenance of the "medieval system"[14] embodied in the FELA itself (315 U.S. at 707, 62 S.Ct. 827) is a unique feature of the transportation industry.

But the particular characteristic of the railroad business which is especially significant with respect to the issue here under consideration is the fact that railroads usually operate long rail lines which extend into many States. Often the corporation is a multi-State entity, domesticated in a number of States. But no railroad is nationwide in extent. As Robert R. Young used to say, "A hog can cross the country without changing cars, but you can't." But though cars are interchanged, each carrier over a joint

Brandeis wrote for the Court, holding that subjection of a railroad to suit for solicitation only imposes an undue burden on interstate commerce. He declared that "orderly, effective administration of justice clearly does not require that a foreign carrier shall submit to a suit in a state in which the cause of action did not arise, in which the transaction giving rise to it was not entered upon, in which the carrier neither owns nor operates a railroad, and in which the plaintiff does not reside." 262 U.S. at 317, 43 S.Ct. at 558. Cf. Hoffman v. State of Missouri ex rel. Foraker, 274 U.S. 21, 22, 47 S.Ct. 485, 71 L.Ed. 905 (1917), also a Brandeis opinion.

13. Railroading may thus be entitled to preservation of its customary treatment, even though its regime may differ from that of other industries, just as baseball is treated differently from other sports under the antitrust laws. Toolson v. New York Yankees, 346 U.S. 356, 357, 74 S. Ct. 78, 98 L.Ed. 64 (1952). Cf. Radovich v. National Football League, 352 U.S. 445, 450–452, 77 S.Ct. 390, 1 L.Ed. 2d 456 (1957).

14. This characterization is that of Justice Robert H. Jackson. Justice Frank-

furter described the FELA as "an antiquated and uncivilized," as well as an "archaic and cruel * * * outmoded, unfair system." Urie v. Thompson, 337 U.S. 163, at 196, 69 S.Ct. 1018, at 1038, 93 L.Ed. 1282; Ferguson v. Moore-McCormack Lines, 352 U.S. 521, at 539, 546, 77 S.Ct. 459, 467, 471, 1 L.Ed.2d 515. He also called it "obsolete" and "anachronistic" (McAllister v. United States, 348 U. S. 19, at 23, 75 S.Ct. 6, 99 L.Ed. 20; Carter v. Atlanta & St. Andrews Bay Ry. Co., 338 U.S. 430, at 438, 70 S.Ct. 226, 94 L.Ed. 236), resulting in "injustices and crudities" (Stone v. New York, C. & St. L. R. Co., 344 U.S. 407, at 410, 73 S. Ct. 358, 97 L.Ed. 441).

Congress has remained impervious to this judicial criticism, probably because the parties most immediately affected, the railroad managements and unions, and their lawyers, seem to be satisfied with the system. The unions presumably feel that FELA verdicts are larger than any workmen's compensation awards would be; and the carriers presumably calculate that on the aggregate it costs them less to risk some large verdicts than it would to pay some compensation, regardless of fault, for every injury.

route operates on its own account, with its own motive power, and the applicable rate or charge is divided among the participating carriers.

Unlike many manufacturing industries which do a nationwide business, and ship merchandise into the territories where they solicit business, a railroad does not by its operations enter the State where it merely solicits. On the contrary, its solicitation merely invites the customer to make use of a service which can only be enjoyed elsewhere.

The railroad is different from a seller of machinery, which is shipped into the forum, and may require the entry of technicians to install it or service it, or require contracts or other local contacts to be made in the area in order to provide a satisfactory product or service to customers in the forum territory.

Suppose a Florida resort hotel solicited business in Western Pennsylvania by advertising in the New York Times (or in the Pittsburgh papers), and then bought a carload of maple syrup in Vermont, but refused to pay for it, alleging defective quality. Does reason or fair play require that a suit by the Vermont seller against the Florida hotel should be litigable in Pittsburgh, by reason of the alluring advertisements inviting Pittsburghers to forsake their own bailiwick and enjoy the facilities provided in Florida for their enjoyment and comfort? Surely not.[15] Railroad solicitation resembles such a situation more than the usual situation where merchandise is shipped into an area in response to solicitation in the forum.

It is also particularly desirable in the railroad industry, with its complex customs and practices, that a definite and clear-cut rule be adopted, susceptible of easy application, both by the parties themselves, their counsel and the courts. The "solicitation without more" rule is of such a character.

It should be possible for litigants to know whether they are in the right court without first preliminarily litigating that issue in every case. It may be satisfactory with respect to the merits of litigation to sue first and then find out whether you have a case,[16] but with respect to jurisdiction this should not ordinarily be necessary.

Railroad litigation should not be subjected to the uncertainties formerly prevailing with respect to the validity of jurisdiction to grant divorces. "Such jurisdiction, it was formerly held, was vested only in the court where the 'matrimonial domicile' was located. This was the last common domicile where both spouses lived together as man and wife. The wife's domicile was presumed to be the same as her husband's; hence if she deserted him, he could get a valid divorce at the matrimonial domicile; but if he abandoned her, his subsequent domicile was not a new matrimonial domicile and he could not obtain an ex parte divorce there. The wife, however, could obtain such a divorce at her subsequent domicile if she were not the party at fault in causing the separation. This doctrine made the jurisdiction or power of the state to grant a divorce dependent upon the merits of the case. It required determination of the domestic dispute between

15. See MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832, 833–834 (C.A. 2, 1958): "Defendant * * * cannot deliver in winter Florida warmth and sunshine to residents of the more northerly states on order by mail, freight or express. There can be no out-of-state delivery on orders taken outside of Florida."

16. An eminent leader of the bar, former judge and public official, says of the Federal Rules of Civil Procedure: "Today they permit a litigant who suspects he has a good case as either plaintiff or defendant to file a complaint or an answer without knowing whether the allegations are true or not, and then use the process of discovery to find out if he is right." Thurman Arnold, Fair Fights and Foul (1965) 266. This procedure resembles the Thurman Arnold technique as head of the Antitrust Division: first file a lot of cases, then ask Congress for an adequate appropriation to try the numerous pending cases, then seek evidence in support of the Government's contentions.

the spouses regarding which one was at fault as a preliminary condition precedent to establishment of the court's jurisdiction." [17]

Finally, it must be emphasized that the problem before us is simply one of statutory construction. The *International Shoe* rule deals with constitutional due process, under the Fourteenth Amendment. Presumably the same constitutional scope would prevail under the Fifth Amendment. We are concerned here merely with the question of how far Congress meant to go when it adopted the present statutory wording in 1910. United States v. Scophony Corp., 333 U.S. 795, 804, 68 S.Ct. 855, 92 L.Ed. 1091 (1948).

■ Congress could, perhaps, as a matter of constitutional power, have provided that the judicial power of any District Court could be exercised throughout the entire nation. But it has not chosen to do so.[18] In a case under federal law, just as in a diversity case, the constitutional question is not reached until the scope of the statutory provision as to venue has been determined. Partin v. Michaels Art Bronze Co., 202 F.2d 541, 543 (C.A. 3, 1953); Bomze v. Nardis Sportswear, 165 F.2d 33, 35 (C.A. 2, 1948). If the *International Shoe* doctrine effected any extension of the constitutional power of Congress (which seems unlikely, if the power of Congress was already plenary), it is clear that Congress has done nothing since 1910 to expand the meaning of "doing business" within the meaning of the FELA venue provision here involved. The courts therefore should not extend the scope of that provision, in the absence of a new "strong arm" statute enacted by Congress.

■ The controlling question, therefore, is: What did Congress mean to include within the scope of the term "doing business" when in 1910 it enacted 45 U.S.C. § 56 in its present wording? The legislative history, as reviewed in the *Kepner* and *Miles* cases,[19] indicates that Congress meant to enable suits to be brought wherever the railroad was operating, that is to say was "not merely soliciting business but actually carrying on railroading by operating trains and maintaining traffic offices within the territory of the court's jurisdiction." 315 U.S. at 702, 62 S.Ct. at 829. Congress felt that a plaintiff should be able to sue in any place "served by the railroad." Ibid. 707, 62 S.Ct. 827. See also Ibid. 715–716, 62 S.Ct. 827; and 314 U.S. at 49–50, 57, 62 S.Ct. 6. Prior to the 1910 amendment, a plaintiff had to sue the carrier at its "residence".[20] Since railroads, as has been seen above, are often multistate corporations operating lengthy rail lines, this was deemed an undue hardship upon a plaintiff. Rather than being forced to sue the railroad at the place where it was incorporated or had its principal office, a plaintiff should be allowed (Congress felt in 1910) to bring suit wherever its rail operations were being conducted.

■ Being satisfied that Congress in 1910 did not intend to disturb the "solicitation without more" doctrine, we conclude that plaintiff here can not maintain the instant action against the C. & O. Railway in this District.

## ORDER

And now, this 23rd day of January, 1969, after argument, for the reasons set forth in the foregoing opinion,

It is ordered that the complaint in the above-styled case be dismissed for lack of venue jurisdiction under 45 U.S.C. § 56.

17. Dumbauld, The Constitution of the United States (1964) 400.

18. Dumbauld, The Constitution of the United States (1964) 362. See particularly Robertson v. Railroad Labor Board, 268 U.S. 619, 622, 45 S.Ct. 621, 69 L.Ed. 1119 (1925); and Cohens v. Com. of Virginia, 6 Wheat. 264, 428–429, 5 L.Ed. 257 (1821).

19. See note 5, supra.

20. See, e.g., Macon Grocery Co. v. Atlantic Coast Line, 215 U.S. 501, 509, 30 S.Ct. 184, 54 L.Ed. 300 (1910); Southern Pacific Co. v. Denton, 146 U.S. 202, 205, 13 S.Ct. 44, 36 L.Ed. 942 (1892).