**UNITED STATES of America,**
**Plaintiff,**

**v.**

**SS OCEAN EAGLE et al., Defendants,**
**(and three other cases).**

**Civ. Nos. 168, 212, 233, 346–68.**

United States District Court
D. Puerto Rico.

Sept. 30, 1969.

Francisco A. Gil, Jr., U. S. Atty., San Juan, P. R., for plaintiff.

Antonio Bird, San Juan, P. R., and Eugene Underwood, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FERNANDEZ-BADILLO, District Judge.

This case came to be heard on the London Steam-Ship Owners' Mutual Insurance Association Ltd.'s (hereinafter referred to as the "Association") Motion to Quash the Service of Process and to Dismiss the Action for Lack of Jurisdiction over the person of the Association on the ground that the service was incomplete and invalid and on the further ground that it was not present or doing business within this district.

The record shows that service was made upon the Association through the Secretary of State of the Commonwealth of Puerto Rico under the Puerto Rican long-arm statute contained in Rule 4.7 of the Rules of Civil Procedure and by serving it through the Association's appointed representative in Puerto Rico,

William Munch, Inc., under Rule 4(c) of the Federal Rules of Civil Procedure.

The Court being fully advised makes the following:

### Findings of Fact

1. Defendant, the Association, is a non-profit company formed pursuant to the British Companies Acts of 1862 and 1867 and the Companies Act of 1948. Its principal object is to carry on the business of effecting and carrying out contracts of insurance upon ships or upon their machinery, etc., or against damage arising out of or in connection with the use of ships.

2. At the times material to events in these actions the Association provided insurance of four classes—protecting and indemnity (Class 5), war risks (Class 7), freight, demurrage and defense (Class 8), and strikes (Class 9). The Association operates on the assessment plan. When members enter ships, or at the beginning of the fiscal year, an "advance call" is made of a stated number of shillings per ton of the contributing tonnage of each entered vessel, which members are required to pay, and as losses are incurred and paid by the Association further calls are made as needed.

3. The Association insured the owners of the SS Ocean Eagle by their entry of her in Class 5, the protecting and indemnity, as evidenced by a certificate of entry dated, London, 9 April, 1968, for the period from noon 20th February, 1968, GMT, for one year against such risks and upon such terms, conditions and limitations, as are stated in the Association's rules of Class 5, protecting and indemnity, with minor exceptions as appear in the certificate. Such insurance was negotiated and arranged in London and the certificate aforesaid was issued in London and the rules aforesaid were promulgated in London.

4. The business of the Association is managed by the Committee of the Association saved to the extent to which it has appointed A. Bilbrough and Co. Ltd. (hereinafter referred to as "Bilbrough"), to manage its affairs. Bilbrough is a British limited company. The Association and Bilbrough have their registered office at Walsingham House, Seething Lane, London, E.C. 3, and another office at 161 A High Street, Orpington, Kent.

5. All the business of the Association is managed from their offices referred to in the above paragraph. No member joins the Association elsewhere, and no ship is entered in any class of the Association elsewhere. Specifically, no insurance of any member or any ship is written or assured elsewhere.

6. One of the essential and fundamental parts of the Association's business as an insurance company is the investigation, adjustment and payment of insurance claims wherever they may arise. The Association, to carry out the functions, appoints a representative in each of the major ports of the world. This appointment is made so that insureds, their masters and agents, and also the Association, may itself have the benefits of the representative's advice and their local knowledge.

7. The Association appointed William Munch, Inc. (hereinafter referred to as "Munch"), a cargo surveyor and marine claim settling agent, as its representative in Puerto Rico through an exchange of letters, the first of which, dated June 11, 1959, reads in part as follows:

"Some little time ago it was suggested to us that you might be willing to act as our representative in San Juan * * * and we are writing you to inquire whether you would be willing to do so * * *"

"Would it also be possible for you, should occasion arise, to help a master requiring assistance at St. Thomas, Virgin Islands? * * * we have no representative there and we wondered whether in case of need you could help a master at St. Thomas."

To that letter Munch replied on June 29, 1959, as follows:

"We received and thank you for your letter dated June 11th * * * however, if we can be of assistance to your goodselves we shall be glad to accept an appointment to act as your representative at San Juan, Puerto Rico. Our activities involve marine loss appraisals and settlements, also marine underwriting * * * "

On July 2, 1959, the Association wrote to Munch acknowledging receipt of the acceptance:

"We thank you for your letter of the 29th ultimo and are glad to hear that you are willing to act as our representative at San Juan, Puerto Rico. We are sending you under separate cover a book of our rules and a list of entered steamships for 1959–1960 and also a copy of our Notes for the Guidance of our representatives."

8. Under the arrangement with the Association Munch had, in respect to the protection and indemnity coverage (Class 5), authority to approve for the Association payments by the owners or agents; had discretion in determining which claims are referred to the Association in London and which are not; had authority or the duty to obtain advice from lawyers in doubtful cases; investigate claims; employ competent cargo and ship surveyors; hiring of independent doctors; compromise and settle claims on behalf of the Association; approve payments of incurred expenses for which legal liability of an association member exists; and within expressed instructions from the Association, authority to give or arrange on behalf of the Association any bail or security in legal proceedings.

9. In respect to freight, demurrage and defense coverage (Class 8), Munch had the duty to investigate cases; give or to obtain advice; and assist a member or master in any case. Under the scope of this coverage Munch reports the facts of the case to the Association.

After the report is sent and instructions are received from the Association, Munch can, and has authority to, approve the taking or defending of proceedings.

10. In fulfilling his duties towards the Association and exercising the authority given Munch was actually engaged in at least eight instances of activity on behalf of the Association and its insured members as follows:

(a) On June 23, 1964, the owner of the SS Marine Coaster cabled Munch telling it that the vessel was entered in London, that Bilbrough was manager and requested an investigation into a claimed damage. Munch made the investigation, reported the results of it to the owners of the vessel and billed the owners who paid Munch.

(b) In October, 1964, the SS Hardenberg discharged at San Juan a shipment of whiskey in partially damaged condition. On November 2, 1964, International Shipping Agencies of San Juan, the ship owner's representative, sent Munch, as representative in Puerto Rico of the Association, a claim for $306.03 in damages which it had received from Manuel San Juan Company. On May 6th, International sent Munch another claim for $5,194.42 which Manuel San Juan had lodged with it. International Agencies' letter of referral in part read as follows:

"We will greatly appreciate your going over the claim in question and will greatly appreciate your informing us of your decision in this case, so as to inform our principal accordingly."

On May 18, 1965, the ship owner, Messrs. Vinke and Co., reported the incident directly to the Association. In part its letter read as follows:

"In October, 1964, your representative at San Juan, Messrs. William Munch, Inc., asked for copies of abstracts and reports covering this case * * * Therefore, we presume that they have kept you informed or have given you a full report. In this connection we shall appreciate to learn

from you whether you agree that this claim is dealt with by your representative direct * * * ”

On May 26, 1965, the Association wrote Munch, and in the last paragraph said the following:

"We cannot trace having received from you any report in connection with this matter and you are now requested to let us have full particulars with your own observations and recommendations. We shall particularly require to know the cause and extent of the damages sustained together with a copy of your surveyor's report, the master's report and log abstracts."

Munch complied and on June 7 billed the Association and the invoice was paid on August 26, 1965.

(c) On March 29, 1967, the M/T World Provincial while docking, damaged a dolphin at Guanica, Puerto Rico. Commonwealth Steamship Company of Ponce (agent for the owner) asked Munch to intervene. The Association also requested a report and inquired about a survey. Munch appointed Francis B. Crocco, Inc. to survey the damages. The survey was made and forwarded by Munch to the Association with its report. The surveyor billed Munch which in turn billed Commonwealth.

(d) On April 2, 1966, the S/T Archer struck and damaged a pile cluster at Guanica, Puerto Rico. On March 1, 1967, Robert L. Schneider, Esq., on behalf of the jetty owner, claimed to the ship owner the damages. On March 14, 1967, the ship owner acknowledged the letter from the jetty owner's lawyer and sent a copy to the Association together with the letter from Mr. Schneider. It was not until March 20, 1967, that the Association requested assistance from its representative in Puerto Rico, Munch. Munch appointed J. A. Potts and Company, Inc., independent marine surveyors at San Juan, to survey the damage. Potts made the survey and Munch sent the survey with a report to Bilbrough. On April 21, 1967, Potts billed Munch for these services.

(e) At approximately 0500 on September 12, 1967 after completion of discharge of crude oil from the M/V Berna, a very heavy spill of oil occurred on the port side of the M/V Berna. This was a consequence of a pump breakage after which the oil in the pump and pipe lines went out into the sea. Hess Oil Company billed the owner for the sum of $2,000 which was the minimum for cleaning up the pollution. By letter to Munch the master of the M/V Berna reported the incident. On September 20, 1967, the Association acknowledged Munch's letter and authorized it to appoint a surveyor to protect the vessel's interest and report on the nature and extent of the damages. It also, in the event that there was a statutory fine, asked William Munch to make every effort to have the amount of that fine mitigated. From then on a lot of correspondence was exchanged between the Virgin Island's Government Officials, Hess Oil Refining Company and Munch. On December 7, 1967, the Association wrote Munch as follows:

" * * * owners say that they called you to ask for approval to settle the bill for cleaning up the harbor in the amount of $2,000 but that they did not receive any reply * * * We have said that we are not approving it for payment until we have heard further word from you * * * ”

On December 27, 1967, William Munch acknowledged the letter of the Association of December 7th and the Association in turn acknowledged William Munch's letter of December 27 on January 3, 1968. William Munch billed the Association for the services and the Association paid it.

(f) On December 2, 1966, the M/V Westco, Panama, enroute from Peru to Yugoslavia called at the Port of Mayaguez, Puerto Rico and landed a mentally-ill Greek seaman. After landing, the seaman was hospitalized at San German,

Puerto Rico for treatment and it then became necessary to repatriate him to Greece. On December 7, 1966, the ship owner's agent in Mayaguez reported the incident to Munch who after that exchanged a whole series of messages and correspondence with the owners, the owners' agents in Mayaguez and with the Association until January 30, 1967, when William Munch reported to the Association the fact that the seaman had been repatriated. William Munch in this case approved for the Association the disbursement of all the expenses by the owners.

(g) On August 6, 1966, at 0400, the M/V William R. Grace, while being docked at the Ochoa Fertilizer Terminal in Guanica, Puerto Rico, damaged two dolphins on the north side of the facility. On August 24, 1966, Marine Transport Lines, agents for the owners, reported the incident to Munch. In respect to this incident from August 20 to November 15, 1966, a great deal of correspondence and messages were exchanged between the owner's counsel, the owners, the Association and William Munch. On November 15, 1966, William Munch hired Captain John Potts to survey the damages to the dolphins. On January 10, 1967, Captain Potts turned in his survey report. On September 9, 1966, Corporation Raymond S. A. submitted an estimate of repairs of the dolphins to Caribbean Nitrogen, the owner of the facility. That estimate was reported to the Association by Munch. On January 12, 1967, Captain John Potts billed Munch for his services and on the 13th, Munch billed the Association for its services and surveyor fees and disbursements. On May 16, 1967, in view of the great difference between the sum of the estimate made by Captain John Potts in his survey and the estimate of costs of repairs submitted by Corporation Raymond S. A. to Caribbean Nitrogen, Munch asked the Association for authority to appoint or hire Captain John Potts as negotiator. The Association acknowledged granting Munch's request and on May 26, 1967, Munch retained Captain John Potts again. On June 12, 1967, Captain John Potts submitted his second report to Munch and on June 16, Munch submitted same to the Association. On June 27, the Association asked Munch of the possibility of having Captain John Potts obtain from Raymond Construction Company a reduction of the charges. Immediately thereafter Munch asked Captain John Potts to discuss possible reduction with Raymond and on July 26, Captain John Potts reported back to Munch to inform that there was no way of obtaining a reduction.

(h) On or about 0600, Monday, August 21, 1966, the M/V William R. Grace, while docking at the Caribbean Nitrogen loading terminal at Guanica, Puerto Rico, hit the upper southwest corner of the truck and barge, bending conveyor tower "B" with its bow causing the breakage of several structural members and considerable deformation of the structure. The accident was reported to the owner of the vessel who cabled Munch and informed the fact that the Association was the insurer and asking that a surveyor be appointed. William Munch immediately appointed Captain Francis B. Grocco as surveyor. William Munch in respect to this incident performed, more or less, for the Association and the owners the same services that it performed in respect to the August 6 incident in which the same vessel was involved.

11. From June 23, 1964, when the Marine Coaster incident was referred to William Munch, Inc., to January 9, 1968, when the M/V Berna incident concluded, a total of approximately 78 communications were exchanged between Munch and the Association members and their

agents including letters, cables and invoices.

From these findings the Court makes the following conclusions of law:

### Conclusions of Law

■ 1. The Court is of the opinion that, at the time material to events in these actions, the Association was transacting and/or doing business in the Commonwealth of Puerto Rico within the provisions of Rule 4(d) (7) of the Federal Rules of Civil Procedure and Rule 4.7 of the Rules of Civil Procedure of the Commonwealth of Puerto Rico. It had sufficient contacts or engaged in sufficient activities within the Commonwealth of Puerto Rico to justify substitute service of process. McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); International Shoe Company v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Kane v. Union of Soviet Socialist Republic, 267 F.Supp. 709, (E.D.Pa.1967) aff'd 394 F.2d 131 (3d Cir. 1968); Commonwealth Oil Rfg. Co. v. Houdry Process Corp., 185 F.Supp. 485 (D.P.R.1960); Gkiafis v. SS Yiosonas, 342 F.2d 546 (4th Cir. 1965); McClanahan v. TransAmerican Ins. Co., 149 Cal.App.2d 171, 307 P.2d 1023 (1957); Henriques v. Gauthiod Marine Ins. Co., 205 App.Div. 8, 199 N.Y.S. 131 (S.Ct. 1st Dept.1923); Appleby v. Insurance Office of Australia Ltd., 119 Misc.Rep. 378, 196 N.Y.S. 575 (S.Ct.1922); Humble Oil & Rfg. Co. v. M. V. John E. Coon, 207 F.Supp. 45 (E.D.La.1962).

■ 2. The Court is of the opinion that the evidence submitted in support of and in opposition to the Association's motion to dismiss clearly reveals that within the provisions of Rule 4(d) (3) of the Federal Rules of Civil Procedure, Munch was acting as managing agent of the defendant within the Commonwealth of Puerto Rico and that service of the summons on Munch was sufficient to bind the defendant. Atlantic Enterprises, Inc. v. National Equipment Rental Ltd., 208 F.Supp. 710, 711 (D.P.R.1962); Martinez v. M. A. Karageorgis, 235 F.Supp. 1012, 1013, 1014 (D.P.R.1963); Executive Air Services, Inc. v. Beech Air Craft, Corp., 254 F. Supp. 415, 417 (D.P.R.1966); Bomze v. Nardin Sportswear, Inc., 165 F.2d 33, 37 (2d Cir. 1948); Boryk v. deHaviland Air Craft Company Ltd., 341 F.2d 666, 669 (2d Cir. 1965); Allegue v. Gulf & South American SS Co., 103 F.Supp. 34, 35 (S.D.N.Y.1952). Schwartz v. District Court, 73 P.R.R. 800 (1952).

3. The service of process on the Association in these four actions is valid and defendant's motion to quash the service of summons and to dismiss the complaint for lack of jurisdiction over the person is therefore denied. It is so ordered.