210

239 So.2d 780

**STATE of Alabama**

**v.**

**John W. NEWBERN, d/b/a Nationwide Advertising Specialty Co., Nationwide Advertising Specialty Co., a Corporation, John W. Newbern, d/b/a Nationwide Advertising Specialty Co.**

**3 Div. 8, 8–A, 8–B.**

Court of Civil Appeals of Alabama.

Jan. 5, 1970.

Rehearing Denied Jan. 20, 1970.

Order after Remandment Aug. 3, 1970.

MacDonald Gallion, Atty. Gen., and Willard W. Livingston and B. Frank Loeb, Asst. Attys. Gen., for the State.

Steiner, Crum & Baker and M. R. Nachman, Jr., Montgomery, for appellees.

THAGARD, Presiding Judge.

These three appeals, consolidated by agreement of the parties, were taken by the State from adverse judgments in the Circuit Court of Montgomery County holding invalid and setting aside final assessments made by the State Department of Revenue against the appellees for Alabama use tax covering the periods December 1, 1967 through June, 1968; July 1, 1965 through November 30, 1967 and April 1, 1962 through March 31, 1965 respectively.

For convenience we quote extensively from appellant's STATEMENT OF THE FACTS, all supported by the record, as follows:

"The Appellee, Nationwide Advertising Specialty Co., was until the end of November, 1967, a sole proprietorship operated by John W. Newbern. As of December 1, 1967, the company incorporated under the name of Nationwide Advertising Specialty Co., Inc. (R. p. 15). John W. Newbern was, during the relevant period, a resident of the State of Texas and maintained his place of business in Arlington, Texas, between Fort Worth and Dallas. The corporation was, during the relevant period, a Texas corporation with principal place of business located in Arlington, Texas

(R. p. 15). Appellee is, according to the testimony of Mr. Mendenhall, who is now the Secretary-Treasurer of Appellee, engaged in the advertising specialty business acting as a jobber for items such as key chains, glass coasters, pen and pencil sets, golf tees, rulers, shoe spoons, golf ball markers, etc. (R. pp. 15–16).

"According to Mr. Mendenhall, a jobber, such as Appellee, receives orders from 'dealers' who take the orders in various parts of the country and send these orders to the jobber, who in turn issues a purchase order to a manufacturer for whatever item is being ordered, instructing that manufacturer to put the ad copy specified by the order that is received and to ship the merchandise directly to the customer who ordered it (R. p. 15).

"Two of these so-called 'dealers' were Appellant's witnesses, White and Beason. Mr. White testified that his first contact with Appellee occurred about twelve years ago when he answered an advertisement which appeared in a magazine asking for salesmen (R. p. 58). This advertisement was similar to the ones appearing in Appellant's Exhibit 2 (R. pp. 155–161). Such advertisement which appears in the August, 1965 edition of the magazine 'Salesman's Opportunity' reads as follows:

" 'Fastest Growing Calendar House in America! Why? We treat salesmen good! The Salesman is king at Nationwide * * * that explains our phenomenal success, our multimillion dollar business. We treat Salesmen good and kind, like the outgoing, friendly human beings they are. We advance full, top commissions weekly, give extra bonuses for volume, furnish new, surprising samples to active men. Still have some territories open. * * * just write and tell me about yourself. Old Man John Newbern, Nationwide Advco, Arlington, Texas.'

"Mr. White testified that he replied to an ad such as this and that Appellee sent him some literature (R. p. 58). In answer to the question 'Did you sell any of their products?', Mr. White stated, 'I began to sell some. For the first two or three years I done very little and I began to give it up two or three times and it seemed like when I was down in the dumps that I would to out and sell two or three or four orders and that pepped me up again * * *' He further testified that after two or three years when the volume of his orders began to pick up, Appellee furnished him free samples, catalogs, order blanks and other sales literature (R. pp. 59–61). Mr. White further testified that Appellee published a weekly newspaper called 'The Nationwide Pavement Pounder, an exclusive weekly newspaper for Nationwide Salesmen' which he, Mr. White received regularly (Appellant's Exhibits Nos. 5 and 6, R. pp. 162–169). Reading from the front page of the March 21, 1964 issue of this weekly magazine, Mr. White quoted as follows: 'We are proud of $1100 sale by Turner of Alabama. Nationwide man Turner of Alabama really stepped out in front by making a pitch to a large capital insurance company with his Larido Rain Bonnets. After convincing them of the great value of giving the Rain Bonnets to their prospective customers, he came away with an order for twenty thousand which put a pocketful of commission cash in his wallet. We are very proud of our man for this sale and certainly want to congratulate Turner of Alabama.' (R. pp. 62, 162).

"Mr. White, in testifying as to the January 11, 1964 issue of the 'Pavement Pounder' quoted from a column written by John Newbern on the first page of this issue (R. p. 162) as follows: 'Dear Fellow Pavement Pounder by John Newbern—I'm going to let a Nationwide Salesman write my column this week. I just got a letter from him, and this is it: "Dear John: Perhaps you might like to hear a New Year's Story. For over one year you have been most generous with samples, the Pavement Pounder, quotations promptly, postage paid envelopes, etc., NONE OF WHICH ARE SUPPLIED BY OTHER ADVERTISING SPECIALTY HOUSES IN SUCH ABUNDANCE—if at all. Nor

do they acknowledge orders promptly to the salesmen the way you do." '

"Mr. White further testified that the confidential list of active Nationwide Salesmen, which was published by Appellee from time to time in the 'Pavement Pounder' was sent separately so that other competitors of Nationwide would not see it. Appellant's Exhibit No. 7 (R. pp. 170–183) is a typical example of such confidential list of active salesmen showing in order of highest volume the number of orders placed by Nationwide salesmen in the various states. This particular monthly standing was for the month of December 1962 and Mr. White's name appears far down the list with a total of 79 orders (R. p. 179); however, there are names of five other salesmen from Alabama whose names are higher on the list than Mr. White's. Mr. White further testified that he was one of the top producers for Appellee for the year 1967 when he sold approximately $8,000 of merchandise for them and received over $2,000 in commissions (R. p. 67). Mr. White further testified that he lived in Glencoe, Alabama, that he did not maintain a place of business in Glencoe, that he did not own or maintain any stock of merchandise in Glencoe, and that he was not in business for himself (R. p. 68).

"Mr. Beason testified that he had been a salesman for approximately ten years for Appellee on a commission basis, that he did not maintain a place of business in Gadsden where he lived, that he did not maintain a stock of merchandise and that Appellee sent to him samples, catalogs, purchase orders and the 'Pavement Pounder' (R. pp. 102–103). He also testified that his first contact wtih Appellee came through answering an advertisement similar to the one contained in Appellant's Exhibit No. 2 (R. pp. 155–161). Mr. Beason, as well as Mr. White, testified that they would take orders for other companies from time to time but that if the item involved was an advertising specialty item listed in Appellee's catalog, they ordinarily took the order for Appellee (R. pp. 108–109; 78–79).

"In tracing a typical transaction, the testimony and evidence showed that although 'dealers' or salesmen such as White and Beason may have had the right to use any sort of purchase order blank they wished (R. pp. 17, 24) they (White and Beason) used only purchase order blanks furnished by Appellee (R. pp. 19–20; 65–68; 185–194; 195–196). These order blanks are labeled in the upper right hand corner either 'Sales Contract' or 'Wholesale Sales Contract' depending upon the date Appellee had them printed. All have 'Nationwide Advertising Specialty Co.' printed in large letters at the top with a blank space underneath in which to insert the name and address of the person to whom the item or items were sold. This order form clearly states that the goods are bought by purchaser from 'the company'. It is signed by the purchaser and has a blank space for the 'dealer's' name and address. The order is then sent by White or Beason to Appellee in Texas for approval (R. pp. 18, 77). If the order is accepted, Appellee fills out an invoice packet referred to as Appellee's Exhibit No. 3 (R. pp. 197–206) the top page of which (R. p. 204) is a purchase order to the manufacturer of its (Appellee's) choice (R. p. 15), instructing said manufacturer to ship the items 'in our name' to the customer in Alabama. Appellee also sends to the manufacturer a duplicate form (R. p. 203) of this order to be returned to them at the time the manufacturer ships the items to the customer and sends its billing to Appellee (R. p. 25). Pasted to the purchase order and duplicate referred to above are shipping labels to be used by the manufacturer which show clearly that the merchandise is from 'Nationwide Advertising Specialty Co.' and instructing the post office to notify Appellee in the event the order is undeliverable (R. pp. 25, 202). Also included in the invoice packet which Appellee prepares is an acknowledgment which it sends to the customer in Alabama notifying him that the order has been accepted and giving him a chance to report to Appellee any corrections or changes which should be made

(R. p. 201) and an acknowledgment to the 'dealer' in Alabama notifying him that the order has been accepted, the amount of the commission to which he is entitled and offering him a chance to make any changes or corrections which he (White or Beason) thinks should be made (R. p. 200). There are also two copies which Appellee keeps for its own files (R. pp. 198–199) and finally there is a notice which Appellee sends to the 'dealer' in Alabama (after the manufacturer has notified Appellee of shipment) informing the 'dealer' that the goods have been shipped (R. pp. 197; 25–28).

"Although Mr. Mendenhall's testimony (R. p. 28) states that there are no communications between Appellee and the 'dealers' other than those contained in Appellant's Exhibits 2 and 3 referred to above, the testimony of Mr. White and Mr. Beason indicates otherwise. Mr. White showed the Court below a copy of a letter written to Liberty National Life Insurance Company in Birmingham, Alabama, by Mr. Jim Roten, Office Manager for Appellee, thanking them for the nice order of combs which 'your company has favored us with.' The letter states further: 'We are enclosing samples of the comb that will be supplied on your order * * * will you please let us know if this comb meets with your approval?' (Appellant's Exhibit No. 8, R. pp. 184; 65–68). This was in reference to an order solicited by Mr. White in 1962 on behalf of Appellee and accepted by Appellee as shown by the testimony and documentary evidence (R. pp. 65–68; 189; 192). Mr. White also testified that Mr. Jack Crawford, Credit Manager for Appellee, did write to him from time to time if a customer was behind in his payments and ask Mr. White to help Appellee out by contacting the customer personally and attempting to procure payment. Mr. White said that he was glad to do this any time to help the company (R. p. 71). Mr. Beason likewise testified that he had had correspondence with Mr. Crawford in which Mr. Crawford had asked Mr. Beason to assist in collecting delinquent accounts or orders that were past due (R. p. 104). Al-though Mr. Mendenhall testified that the manufacturer had a recommended or suggested retail price which could be adjusted either up or down by the 'dealer' and that Appellee had no control over the price of the items (R. pp. 18, 22, 23), the testimony of both Mr. White and Mr. Beason was to the contrary. At one point Mr. White, in describing how he sold some desk calendars to a customer for a price below that suggested by the manufacturer said, 'If the price was considerably lower, I have checked it several times and I checked that order there with Liberty National and I checked one time with this same company on desk calendars and they told me the lowest I could go and we would split the profit and I went back and I got the comb order and at that time I got the calendar order and this time I don't know if I did it or not' (R. p. 72). When asked if there had ever been any time when Appellee had refused to go along with him on a suggested price reduction, he answered, 'No, sir. I have cut prices say a nickel on a dollar item and I have done that before and they went along with it and they cut me half and them half and that's happened from time to time but I do not make that a practice. I only do it when I have to.' (R. p. 73).

"In discussing the method of payment, both from the standpoint of the customer and himself, Mr. White stated that all orders were mailed directly to Appellee either with a check for full payment from the customer or on open account. Occasionally, he stated, an order was sent in with a deposit from the customer. When that occurred, he usually sent the deposit in to the company with the order and waited to receive his commission from the company. He did state that on rare occasions, he retained his commission out of the deposit and sent the balance to the company but this only occurred rarely. Ninety-nine percent of the time the orders would go in open account or with any money collected from the customer and he would let the company send him a commission check each Thursday based upon all orders

processed during the preceding week (R. p. 69).

"The testimony of Mr. Mendenhall was to the effect that of the manufacturers suggested price (catalog price) the manufacturer received from Appellee in payment for the order an amount constituting at least 50% of the amount charged to the customer in Alabama; and that of the remaining 50% Appellee got 25% and Mr. White or Mr. Beason got the remaining 25% (R. p. 21, 22). The testimony of Mr. White, while in agreement with that of Mr. Mendenhall that the manufacturer received a set amount from Appellee, was in conflict in stating that the remainder over and above the manufacturer's price might vary depending on the transaction in that he and Appellee would agree to sell to a customer for less in order to meet competition in which cases Appellee always went along on the basis that it would share the loss equally with Mr. White. In other words, Mr. White's commission check would be less and the amount of profit retained by Appellee would be equally less (R. pp. 72–73; 75–77). Mr. White also testified that he sent Appellee all of the orders he got from people in Alabama for advertising specialties, although orders for book matches and printed material went to other companies (R. p. 78).

"Mr. White also testified that during the years in question there had been a few orders where customers had canceled either because they didn't have the money or the merchandise was unsatisfactory and that when this had happened his commissions were charged back to him if they had already been paid but that he had never been held responsible for payment of the order itself (R. pp. 70, 88–89).

"There was much testimony by Messrs. Mendenhall, White and Beason with reference to 'sales tax' which had been in some instances invoiced to a customer in Alabama by both Mr. White and Mr. Beason and later paid by the customer to Appellee. The testimony indicated that Appellee then forwarded the tax to Messrs. White and Beason, respectively, and that neither of them had a sales tax number or paid sales tax to the State of Alabama. Both men admitted doing this but made it clear that this was done only on occasions when the customer in Alabama insisted that it be billed as tax. They also made it clear that when they did this the tax was always paid first to Appellee and that when Appellee sent the money to them they did not know what else to do with it but keep it since they did not believe that they were in business for themselves and should register under the Alabama Sales Tax Law (R. pp. 55, 81, 82, 83, 105, 106).

"Mr. Mendenhall testified that during the year 1962, Appellee did business with 108 'dealers' in Alabama, of whom 5 received $600 or more from Appellee in the form of commissions; for the year 1963, Appellee had 113 'dealers' of whom 7 earned $600 or more; for the year 1964, Appellee had 101 'dealers' in Alabama of whom 5 earned more than $600; for the year 1965, Appellee had 119 'dealers' in Alabama of whom 5 earned more than $600; for the year 1966, Appellee had 94 'dealers' in Alabama of whom 5 earned more than $600; for the year 1967, Appellee had 87 'dealers' in Alabama of whom 7 were paid more than $600; and for the year 1968, Appellee had 80 'dealers' in the State of Alabama of whom 10 earned more than $600 (R. pp. 30–31)."

Appellee's STATEMENT OF THE FACTS does not differ materially from that quoted above except that it contains the opinion, with findings, of the trial court.

The assessments were made under the provisions of Title 51, Secs. 790 and 792, Subsection (c), of the 1940 Recompiled Code of Alabama. Section 792(c) reads:

" * * * Every seller engaged in making retail sales of tangible personal property for storage, use or other consumption in this state, who: * * * (c) solicits and receives purchases or orders by agent or salesman, * * *."

shall report the sales and pay the use tax.

So, the only questions for this court to determine are: (1) Whether or not, as a matter of law, the 100 odd persons in Alabama who solicited and obtained orders in Alabama and mailed them to appellees were agents *or* salesmen wtihin the purview of the statute; (2) Whether or not the activities of these solicitors and their relationship with appellees constituted such a nexus between the appellees and the state as to make constitutional the levying of the tax.

Appellant argues three propositions and groups the argument of his assignments of error accordingly. We think, however, that the crux of the case is covered under Section II of his argument which imputes error to the lower court in reaching the conclusion of law that appellant lacks jurisdiction or "nexus" under Sections 790(c) and 792(c), supra, to hold appellee responsible for collecting its use tax based upon sales made to consumers in Alabama through agents or salesmen who solicit orders for sales in Alabama, and that it should not be necessary to discuss the other two groups of assignments.

The facts in this case are well summarized in *appellant's* STATEMENT OF THE FACTS, hereinabove quoted, so there is little need for us to discuss them. However, there are a few facts to which we make special reference. The first was appellee's advertisement in the magazine "Salesman's Opportunity" from which we quote excerpts: "We treat *salesmen* good. (emphasis ours)—"We treat *salesmen* good and kind, like the outgoing, friendly human beings they are. (again, emphasis ours) We advance full, top commissions weekly, give extra bonuses for volume, furnish new, surprising samples to active men. Still have some territories open." We note that appellee advertised for commission salesmen, not brokers, and that it was this advertisement that made for the first contact between appellee and the witness White and a similar one that brought witness Beason into the fold. Then, there was appellee's weekly newspaper "The Na-tionwide Pavement Pounder" from which we quote one sentence: "We are very proud of *our man* (emphasis supplied) for this sale and certainly want to congratulate Turner of Alabama." Then, from the January 11, 1964 issue of the "Pavement Pounder" we find this: "I'm going to let a *Nationwide Salesman* (emphasis supplied) write my column this week." It is obvious that Nationwide regarded its many solicitors as its "Salesmen" for everything but tax purposes. The record discloses that in at least one instance the appellee wrote a letter of thanks to Liberty National Life Insurance Company for an order for combs taken by witness White, and sent Mr. White a copy of the letter. The state's witnesses White and Beason testified that they would take orders for other companies from time to time but that most of their orders for advertising specialties went to appellees. In Scripto, Inc. v. Carson, 362 U.S. 207, 211, 80 S.Ct. 619, 622, 4 L.Ed.2d 660, the United States Supreme Court said:

> " * * * Moreover, we cannot see, from a constitutional standpoint, 'that it was important that the agent worked for several principals.' * * * "

The testimony also discloses that occasionally appellee's men collected for the merchandise with the order and mailed both the order and the collection to appellee; also, that when customers were delinquent in paying for merchandise, appellee would request its "man" who had taken the order to call upon the customer and prod him into paying the account; and that in some instances when the customer insisted upon paying the use tax appellee's man would accept the tax and forward it to appellee, who in turn would return it to its man together with his commission. Appellee always mailed checks to its men for their commissions, and even when the man collected with the order he mailed the entire collection to appellee without deducting his commission and appellee sent its check to its man in payment of his commission.

From the foregoing aspects of the testimony we are clear to the conclusion that

appellee's 100 odd "men" (see quote above from the "Nationwide Pavement Pounder") in Alabama were commission salesmen within the purview of subsection (c) of the statute, supra, even though they may not have been agents in the usually accepted sense of the term. In J. A. Fay and Egan Co. v. Brown Machinery Co., Mo. App., 14 S.W.2d 491, 496, appears this statement:

> "In Webster's New International Dictionary, a representative is defined to be one 'Being, or acting as, the agent or substitute for another, exp. through delegated authority,' and 'One who represents others or another in a special capacity; an agent, deputy or substitute.' A 'salesman,' on the other hand, is defined as 'One whose occupation is to sell goods or merchandise.'"

We now advert to the authorities principally relied upon by appellee, and we discuss them in the order in which they are cited in appellee's propositions III, IV, and V.

We think these quotes from Justice Harwood's opinion in State v. Lane Bryant, Inc., 277 Ala. 385, 171 So.2d 91, 92, clearly distinguish that case from the case at bar:

> "Lane Bryant does no business in Alabama through agents, independent contractors, or otherwise and its sole business connection with this state is that it mails catalogs to Alabama residents from outside the state, and mails from Indianapolis any merchandise that may be ordered by Alabama residents. No delivery of such ordered merchandise is made by truck or common carrier."
>
> \*       \*       \*       \*       \*       \*
>
> "\* \* \* No merchandise is purchased or delivered in any other way than by use of the United States mails."
>
> "\* \* \* Payment for merchandise purchased by residents of Alabama is never made to Lane Bryant *in Alabama* nor to any agents, salesmen, or representative of Lane Bryant in Alabama." (Emphasis supplied)
>
> \*       \*       \*       \*       \*       \*

> "Lane Bryant has never sold, or solicited or promoted sales by, or received purchases or orders from any employee, agent, *salesman, or other person, firm or corporation in Alabama.*" (Emphasis supplied)

The trial court in the Lane Bryant case, in its decree, quoted approvingly by the Supreme Court and relied upon heavily by appellee, said:

> "The Court is of the opinion that there must be a distribution of catalogues in a manner sufficient to provide a business nexus with Alabama—by agent or salesman, or, *at a very minimum, by an independent contractor* (emphasis supplied) within the State of Alabama; \*   \*   \*."

Contrast this with the fact that in this case the appellee had more than one hundred *salesmen* or *independent contractors* within the state, some of whom occasionally collected with the order and remitted the whole collection to appellee; sometimes appellee called upon its men in Alabama to help collect delinquent accounts in Alabama, and there was some correspondence between appellee and its men about price reductions in order to meet competition. Moreover, in view of the holding of the U. S. Supreme Court in *Scripto*, supra, the fact that the Alabama statute includes *"salesmen,"* and the language of the Alabama Supreme Court in State v. Lane Bryant, supra, we do not think it material whether appellee's contacts in Alabama were *salesmen, independent contractors,* or *dealers.*

Appellee next cites State v. MacFadden-Bartell Corporation, 280 Ala. 386, 194 So.2d 543, as an authority supporting its position in this case. MacFadden-Bartell, a Delaware corporation with its principal place of business in New York City, was engaged in the business of publishing various periodical magazines. During the assessment period subscriptions were sold to residents of Alabama in two different ways. About one-half were sold by EBSCO, an Alabama corporation, and the

other half by what was termed "direct mail subscriptions." EBSCO was a corporation engaged in many business enterprises, one of which was the sale of magazine subscriptions. It sold subscriptions to publications of many different publishers. MacFadden-Bartell was one of the publishers whose magazines it sold, and MacFadden-Bartell had no financial interest in EBSCO, exercised no control over it and furnished no sales or promotional material to it in connection with its magazines. MacFadden-Bartell established a subscription price for each separate magazine, the same price it charged the subscribers on direct mail subscriptions. The average and usual amount paid by EBSCO to MacFadden-Bartell was about 10 per cent of the subscription price collected, and it retained the other 90 per cent as its gross profit. EBSCO prepared its own catalogs and sales material and in many instances the publications of MacFadden-Bartell were included in a "package" prepared by EBSCO which included magazines published by several different publishers. The arrangement between EBSCO and MacFadden-Bartell required only that EBSCO remit the agreed upon amount with respect to each subscription sold.

When EBSCO sent an order for a subscription to MacFadden-Bartell in New York it paid the previously agreed upon price at that time. MacFadden-Bartell then notified its printer to put the name of the new subscriber on the mailing list to receive the magazine as published. The printer then placed the magazine in the mail each month (or week, as the case may be).

As to the "direct mail" subscriptions involved, the orders for subscriptions and payment therefor were sent directly to MacFadden-Bartell in New York by the Alabama subscribers. These subscriptions were the result of circulars sent by mail by MacFadden-Bartell over the United States, including Alabama, advertising a particular magazine. These magazines were delivered to the Alabama subscriber by U. S. mail.

EBSCO was registered with the Department of Revenue as a dealer and collected and remitted to the State the sales tax on each subscription sold.

From these facts the State contended that EBSCO was an agent of MacFadden-Bartell so as to bring MacFadden-Bartell within the purview of the use tax sections, requiring it to collect the use tax both on the sales made by EBSCO and on those made directly. The court said "The evidence fails to sustain the State's contention," and then went on to say, inter alia,

"* * * Has that required connection been established by MacFadden-Bartell under the facts of this case? Let us look at the relationship between EBSCO and MacFadden-Bartell. Under the facts in this case EBSCO agrees to pay to MacFadden-Bartell a certain amount on each subscription it sells. It makes this arrangement in advance of the sale. EBSCO keeps all over that amount. It agrees only to pay the publisher a certain percentage amount of the subscription price to the customer. Presumably therefore, EBSCO could sell a $4.00 subscription (the price to the public set by MacFadden-Bartell) for $6.00 and under its agreement with MacFadden-Bartell send to it only forty cents, keeping the balance as profit. EBSCO is not being paid a commission on sales it makes. Rather, it is operating its own business and retaining a profit over and above the cost to it of subscriptions sold. It is a situation clearly distinguishable from Scripto, Inc. v. Carson, 105 So.2d 775 (Fla.), 362 U.S. 207, 80 S.Ct. 619, 4 L. Ed.2d 660, relied on heavily by the State. In that case a Georgia seller was compelled to collect the Florida use tax because of its solicitation of sales within the state through 'independent brokers' located in Florida. The Supreme Court of the United States found that Florida could constitutionally compel the collection of the tax because under the facts

in that case there existed a sufficient nexus. In that case there were approximately 10 'salesmen' working for Scripto (but not exclusively for Scripto) within the State of Florida. They took orders for goods and sent these orders to Atlanta for acceptance by Scripto. If the order were accepted, payment was made by the Florida customer directly to Scripto (or a division thereof, the distinction not being material). The Florida 'salesman' was paid an agreed commission by Scripto for soliciting and obtaining the orders. The Supreme Court of the United States held that Florida could constitutionally require the collection of its use tax by Scripto, * * *"

Also,

" * * * In the case at hand EBSCO is not being paid a commission on the sales it makes and is not soliciting orders for MacFadden-Bartell. Rather it is soliciting business for itself for a profit. It seems to us that what EBSCO is in effect doing insofar as its arrangement with MacFadden-Bartell is concerned, is negotiating a price by which it purchases magazines from the publisher. It then resells these magazines to its customers, retaining all income from the sale over and above its cost. Were it not for the very nature of magazine subscriptions the merchandise bought by EBSCO could be shipped to it in Alabama for later retail sale just as any other merchandise bought might be. It would appear that EBSCO is in effect buying the subscriptions at wholesale for later retail to the public, within the meaning of Title 51, § 787(d). Indeed, that is the way EBSCO has treated the matter. When it sells a subscription to a customer, it collects the Alabama sales tax and remits it to the State.

"We conclude, therefore, that the trial court correctly determined that EBSCO was not the 'agent' or 'representative' or 'independent contractor' for MacFadden-Bartell within the meaning of the Alabama statutes as construed in State v.

Lane Bryant, Inc., supra, and that therefore there is the abscence of the sufficient business nexus with the State of Alabama insofar as appellee is concerned for the State of Alabama to require it to collect a use tax either as to sales made by EBSCO or those made directly with which EBSCO has no connection."

In our case Nationwide advertised for "salesmen", called them "salesmen" and "our man" in its magazine, furnished catalogs, samples and order blanks to what it calls "dealers," received remittances in full from its "dealers" and then paid their commissions, and sometimes called upon them to prod customers into paying their delinquent accounts. The relationship between MacFadden-Bartell and EBSCO is so obviously different from that of Nationwide and its "salesmen" or "men" as to leave little room for argument.

Factually, National Bellas Hess v. Illinois, 386 U.S. 753, 754, 87 S.Ct. 1389, 1390, 1391, 1392, 18 L.Ed.2d 505, is on all fours with State v. Lane Bryant, supra. We quote from Mr. Justice Stewart's opinion:

" '(National) does not maintain in Illinois any office, distribution house, sales house, warehouse or any other place of business; it does not have in Illinois any agent, *salesman, canvasser, solicitor or other type of representative* to sell or take orders, to deliver merchandise, to accept payments, or to service merchandise it sells; * * *." (Emphasis supplied)

\* \* \* \* \* \*

" * * * Where the sales were arranged by local agents in the taxing State, we have upheld such power. * * * We have reached the same result where the mail order seller maintained local retail stores. * * * In those situations the out-of-state seller was plainly accorded the protection and services of the taxing State. The case in this Court which represents the furthest constitutional reach to date of a State's power to deputize an out-of-state retailer as its collection agent for a use tax is Scrip-

to, Inc. v. Carson, 362 U.S. 207, 80 S. Ct. 619, 4 L.Ed.2d 660. There we held that Florida could constitutionally impose upon a Georgia seller the duty of collecting a state use tax upon the sale of goods shipped to customers in Florida. In that case the seller had '10 wholesalers, jobbers, or "salesmen" conducting continuous local solicitation in Florida and forwarding the resulting orders from that State to Atlanta for shipment of the ordered goods.'" (Citation omitted)

"But the Court has never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail. * * *"

And now we quote at length from Scripto v. Carson, supra:

"* * * The contract (with the solicitor) specifically provides that it is the intention of the parties 'to create the relationship * * * of independent contractor.' * * * Each salesman is furnished catalogs, samples, and advertising material, and is actively engaged in Florida as a representative 'of Scripto for the purpose of attracting, soliciting and obtaining Florida customers' for its mechanical advertising specialties. Orders for such products are sent by these salesmen directly to the Atlanta office for acceptance or refusal. If accepted, the sale is consummated there and the salesman is paid his commission directly. No money passes between the purchaser and the salesman—although the latter does occasionally accept a check payable to the appellant, in which event he is required to forward it to appellant with the order." (Parenthesis supplied)

\* \* \* \* \* \*

"Florida has well stated the course of this Court's decisions governing such levies, and we need but drive home its clear understanding. There must be, as our Brother Jackson stated in Miller

Bros. Co. v. State of Maryland, 1954, 347 U.S. 340, 344–345, 74 S.Ct. 535, 539, 98 L.Ed. 744, 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' We believe that such a nexus is present here. First, the tax is a nondiscriminatory exaction levied for the use and enjoyment of property which has been purchased by Florida residents and which has actually entered into and become a part of the mass of property in that State. The burden of the tax is placed on the ultimate purchaser in Florida and it is he who enjoys the use of the property, regardless of its source.

We note that the appellant is charged with no tax—save when, as here, he fails or refuses to collect it from the Florida customer. Next, as Florida points out, appellant has 10 wholesalers, jobbers, or 'salesmen' conducting continuous local solicitation in Florida and forwarding the resulting orders from that State to Atlanta for shipment of the ordered goods. The only incidence of this sales transaction that is nonlocal is the acceptance of the order. True, the 'salesmen' are not regular employees of appellant devoting full time to its service, but we conclude that such a fine distinction is without constitutional significance. The formal shift in the contractual tagging of the salesman as 'independent' neither results in changing his local function of solicitation nor bears upon its effectiveness in securing a substantial flow of goods into Florida. This is evidenced by the amount assessed against appellant on the statute's 3% basis over a period of but four years. To permit such formal 'contractual shifts' to make a constitutional difference would open the gates to a stampede of tax avoidance. See Thomas Reed Powell, Sales and Use Taxes: Collection from Absentee Vendors, 57 Harv. L.Rev. 1086, 1090. Moreover, we cannot see, from a constitutional standpoint, 'that it was important that the agent worked for several principals.' Chief

Judge Learned Hand, in Bomze v. Nardis Sportswear, 2 Cir., 165 F.2d 33, 36. The test is simply the nature and extent of the activities of the appellant in Florida. In short, we conclude that this case is controlled by General Trading Co., [General Trading Co. v. State Tax Comm., 322 U.S. 335, 64 S.Ct. 1028, 88 L.Ed. 1309] supra. As was said there, 'All these differentiations are without constitutional significance. Of course, no State can tax the privilege of doing interstate business. See Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823. That is within the protection of the Commerce Clause and subject to the power of Congress. On the other hand, the mere fact that property is used for interstate commerce or has come into an owner's possession as a result of interstate commerce does not diminish the protection which he may draw from a State to the upkeep of which he may be asked to bear his fair share.' 322 U.S. at page 338, 64 S. Ct. at page 1029.

"Nor do we believe that Florida's requirement that appellant be its tax collector on such orders from its residents changes the situation. As was pointed out in General Trading Co., this is 'a familiar and sanctioned device.' Ibid. Moreover, we note that Florida reimburses appellant for its service in this regard."

Appellee argues eloquently that Scripto is not applicable to this case because Scripto representatives had written contracts and limited territories, whereas appellee's "dealers" had no written contracts and were not limited to specific territories. But appellee's "dealers" had the written promise of appellee to pay commissions on sales and did pay them. Scripto undertook by its written contract to "create the relationship of independent contractor" but the Supreme Court said in effect: "No, you can't get away with that fiction." Nor do we think the assigning of limited territories in

Scripto is a sufficiently differentiating factor.

We hold that the law as enunciated in Scripto is the law of this case; that the findings of the learned trial judge as to the law of the case were erroneous, and that the same should be

Reversed and rendered.

## ON REHEARING

PER CURIAM:

In his original brief, appellee cited some twenty-five decisions. We thought we discussed all that were "on target"—that is, all that had to do with the efforts of a state to assess and collect use tax from nonresidents doing business in the state either solely by mail order or by agents or salesmen—but since distinguished counsel for appellee is obviously so unhappy with what we wrote, we are extending our opinion to meet some, if not all, of his plaints on application for rehearing.

We disagree with learned and distinguished counsel for appellee in his assertion that "this Court, in its initial effort, has now swept aside controlling state and federal precedents consistently applied by the Supreme Court of Alabama and by the court below (to which almost all tax appeals initially go); has unmade the law which had been so carefully developed by the legislature and the courts; and has made some new law of its own."; and "Moreover, in the process, this Court has thrown aside settled concepts of appellate review—'our most quoted rules'— established principles which have existed as long as appellate courts have existed in this state."

On the contrary we find no fault with any of the pronouncements, that have come to our attention, of the Alabama Supreme Court on the subject of assessing use taxes against nonresidents, and we do not think our holding in this case is in conflict with any of the opinions of the Supreme

**222**

Court on the subject. Evidently they have not been confronted with a case as factually on all-fours with the *Scripto* case, supra, as is this one.

Appellee says that we did not even mention the State v. West Point Wholesale Grocery Company case, Ala., 223 So.2d 269, upon which it heavily relied. That case was based upon the assessment by the state of a franchise tax, a permit tax, and an admission tax against the West Point company, a Georgia corporation, with headquarters in Georgia, whose business was wholesaling groceries, hardware, paper products and other items. A large part of their volume consisted of sales made to retailers in Alabama by six salesmen, and the West Point company sent its trucks into Alabama to deliver the merchandise. The Supreme Court sustained the trial court in holding that the assessment was invalid, but Justice Harwood who wrote the opinion took pains to point out that the case was not governed by the law of the use tax cases.

Also, the appellee takes us to task for having reversed the trial court on its finding of facts. If we did not say it before, we say now that we think the trial court was plainly and palpably wrong in its finding of facts and in its conclusions of law as applied to the facts.

The first sentence of appellee's brief reads: "This Court's opinion of January 5, 1970 represents its maiden effort in the field of state sales and use taxation." We make the observation that the appellee carried us to the woodshed so effectively that we fear that we have now lost our "maidenly status."

We adhere to our original conclusions. Opinion extended. Application for rehearing overruled.

After remandment in 3rd Div. 8

Whereas, the Supreme Court of Alabama, did, on the 10th day of July, 1970, on a writ of certiorari to this Court, affirm the judgment of this Court, wherein the decree of the Circuit Court of Montgomery County, in Equity, was reversed and annulled; and the cause was remanded to this Court with directions to reverse and remand the cause to the Circuit Court of Montgomery County, Alabama, in Equity, solely for the purpose of determining the amount of taxes due.

It is therefore ordered, adjudged and decreed, in accordance with the judgment of the Supreme Court of Alabama, that the cause be and the same is hereby remanded to the Circuit Court of Montgomery County, Alabama, in Equity, for the sole purpose of determining and fixing the amount of taxes due and with directions to determine and fix the amount of taxes due.

It is further ordered and adjudged that John W. Newbern, d/b/a Nationwide Advertising Specialty Co., the appellee in this Court, pay all costs of appeal in this Court and in the Court below, for which costs let execution issue.*

---

* Similar orders were entered in 3 Div. 8–A and 3 Div. 8–B.